# 17-0063-CV

## United States Court of Appeals

### *for the*

## Second Circuit

---

TONYA BROWN, JOHN ELSTAD, ELIZABETH HOMAN,
ALBERT GOEKEN, JEFF SAMPERE,

*Plaintiffs-Appellants,*

– v. –

CERBERUS CAPITAL MANAGEMENT, L.P., CERBERUS COVIS LLC,
COVIS HOLDINGS L.P., COVIS MANAGEMENT INVESTORS LLC,
COVIS US HOLDINGS, LLC, COVIS MANAGEMENT INVESTORS US LLC,
COVIS PHARMACEUTICALS, INC., ETHAN KLEMPERER, MICHAEL
KELLY, MICHAEL WELLS, PRINCETON BIOPHARMA COINVESTMENT
I, L.P., PRINCETON BIOPHARMA CAPITAL PARTNERS, LLC,
ALEXANDER BENJAMIN,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFFS-APPELLANTS

JOSHUA L. SEIFERT
JOSHUA L. SEIFERT PLLC
*Attorney for Plaintiffs-Appellants*
40 Worth Street, 10th Floor
New York, New York 10013
(646) 527-7366

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................... 2

STATEMENT OF THE ISSUES PRESENTED ................................. 3

STATEMENT OF THE CASE ........................................................... 4

STATEMENT OF FACTS .................................................................. 9

I.    Cerberus Commandeers the Covis Companies .................... 9

II.   The Pharma Defendants Promise Plaintiffs
Millions of Dollars for Their investment ..................... 10

III.  Cerberus Creates the New
Companies to Defraud Plaintiffs ....................................... 11

IV.  Cerberus Issues Illusory 2013 Award Agreements .......... 12

V.   In Breach of Their Fiduciary Duties,
The Pharma Defendants Misrepresent
the 2013 Award Agreements ................................................. 13

       A.   In Breach of His and the Pharma
Defendants' Fiduciary Duties, Klemperer
Misrepresents the 2013 Award Agreements ............................14

       B.   In Breach of their Fiduciary Duties, the Pharma  Defendants
Distribute Opaque Equity Schedules ........................................16

       C.   In Breach of His and the Pharma
Defendants' Fiduciary Duties, Collins
Misrepresents the 2013 Award Agreements ............................16

VI.  Plaintiffs Execute the 2013 Award Agreements ............. 18

VII.  The Pharma Defendants Conceal
Their Fraud While Selling the Rights
for More than $1 Billion in Profit ................................... 18

A.     The Pharma Defendants Cancel Most
of Plaintiffs' Unvested New Equity in Bad Faith .................... 18

B.     The Pharma Defendants Issue Illusory Repurchase
Agreements to Cancel Plaintiffs' Vested New Equity ............. 19

C.     The Pharma Defendants
Admit the New Equity Was Illusory ......................... 20

D.     Kelly and Benjamin Misrepresent the Rights
are Worth $478 Million to Divert Plaintiffs'
Attention from the Pharma Defendants' Fraud ...................... 22

E.     Concordia Announces It Acquired
Most of the Rights for $1.2 Billion ........................... 24

VIII. PROCEEDINGS BELOW ................................................ 25

STANDARDS OF REVIEW ............................................. 29

SUMMARY OF ARGUMENT ........................................... 30

ARGUMENT .................................................. 32

I.     THE AMENDED COMPLAINT
STATES A VIOLATION OF SECTION 10(B) ................................... 32

A.     The Pharma Defendants Used
Deceptive Devices to Defraud Plaintiffs................................... 33

     1.     The Pharma Defendants
Engaged in Insider Trading............................... 34

         a.     The Pharma Defendants Were
Plaintiffs' Fiduciaries with a Duty to Disclose ............. 34

         b.     The Pharma Defendants' Breached
Their Fiduciary Duties by Omitting and
Misrepresenting Material Information .......................... 36

     2.     The Pharma Defendants
Created Sham Investments ................................38

B. Plaintiffs Allege Materiality and Causation .................................39

 1. The Pharma Defendants'
  Deception Related to Material Facts .............................39

 2. The Pharma Defendants'
  Deception Caused the Transactions ...............................40

 3. The Pharma Defendants' Deception
  Proximately Caused Plaintiffs' Loss ...............................41

C. The Allegations Give Rise
 to a Strong Inference of Scienter ................................................42

 1. The Pharma Defendants
  Had Motive and Opportunity .........................................44

  a. The Pharma Defendants
   Realized Concrete Benefits ............................ 44

  b. Klemperer Realized, and Collins
   Would Have Realized, Concrete Benefits ................... 45

  c. The District Court's Remarks
   Regarding Collins's Scienter
   Conflated Distinct Legal Concepts ............................. 46

 2. The Pharma Defendants'
  Misconduct was Conscious ............................................48

  a. The Pharma Defendants'
   Conduct Was Intentional ................................. 48

  b. The Pharma Defendants'
   Conduct was Reckless .................................... 50

  c. The Pharma Defendants' Misconduct over 2014
   and 2015 is Strong Circumstantial Evidence
   They Never Intended to Honor Their Promises ........ 51

D. Plaintiffs Allege Harm ................................................................53

E. The District Court Improperly Considered
 Documents Outside the Amended Complaint ..........................54

F.      Plaintiffs' Remaining Claims Were Adequately Alleged ...........56

II.    THE DISTRICT COURT ABUSED ITS
       DISCRETION BY DENYING LEAVE TO AMEND........................... 56

CONCLUSION.................................................................................... 59

CERTIFICATE OF COMPLIANCE ................................................. 60

# TABLE OF AUTHORITIES

## Cases

*A.T. Brod & Co. v. Perlow*,
　375 F.2d 393 (2d Cir. 1967) .......................................................... 4, 32, 34

*Acticon AG v. China North East Petroleum Holdings Ltd.*,
　615 F. App'x 44 (2d Cir. 2015) ................................................... 43

*Affiliated Ute Citizens v. United States*,
　406 U.S. 128 (1972) ................................................... 33, 40, 53

*American Society of Mechanical Engineers v. Hydrolevel Corp.*,
　456 U.S. 556 (1982) ................................................... 43

*Caputo v. Pfizer, Inc.*,
　267 F.3d 181 (2d Cir. 2001) ................................................... 58

*Castellano v. Young & Rubicam, Inc.*,
　257 F.3d 171 (2d Cir. 2001) ................................................... passim

*Chiarella v. United States*,
　445 U.S. 222 (1980) ................................................... 33, 34, 36

*Eminence Capital, LLC v. Aspeon, Inc.*,
　316 F.3d 1048 (9th Cir. 2003) ................................................... 58

*Employees' Retirement System v. Blanford*,
　794 F.3d 297 (2d Cir. 2015) ................................................... 36, 44

*Faulkner v. Beer*, No. 03 Civ. 5284 (GBD),
　2005 U.S. Dist. LEXIS 3074 (S.D.N.Y. Feb. 25, 2005),
　*vacated and remanded*, 463 F.3d 130 (2d Cir. 2006) ........................ 54, 55

*Filler v. Lernout (In re Lernout & Hauspie Sec. Litig.)*,
　236 F. Supp. 2d 161 (D. Mass. 2003) ................................................... 38

*Foman v. Davis*,
　371 U.S. 178 (1962) ................................................... 57

*In re Parmalat*,
　376 F. Supp. 2d 472 (S.D.N.Y. 2005) ................................................... 32, 33, 38

*In re Salix Pharmaceuticals., Ltd.,*
No. 14 Civ. 8925 (KMW), 2016 U.S. Dist.
LEXIS 54202 (S.D.N.Y. Apr. 22, 2016) ................................................. 51

*Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Securities, LLC,*
797 F.3d 160 (2d Cir. 2015) ................................................. 29

*Luce v. Edelstein,*
802 F.2d 49 (2d Cir. 1986)................................................. 48, 50, 51, 58

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
513 F.3d 702 (7th Cir. 2008) ................................................. 42, 50, 51

*McMahan & Co. v. Wherehouse Entertainment, Inc.,*
65 F.3d 1044 (2d Cir. 1995) ................................................. 53

*Milligan v. Anderson,*
522 F.2d 1202 (10th Cir. 1975)................................................. 47

*Novak v. Kasaks,*
216 F.3d 300 (2d Cir. 2000) ................................................. passim

*Osofsky v. Zipf,*
645 F.2d 107 (2d Cir. 1981) ................................................. 53

*Ouaknine v. MacFarlane,*
897 F.2d 75 (2d Cir. 1986)................................................. passim

*Pujol v. Shearson American Express, Inc.,*
877 F.2d 132 (1st Cir. 1989)................................................. 47

*SEC v. Obus,*
693 F.3d 276 (2d Cir. 2012) ................................................. 48

*SEC v. Texas Gulf Sulphur Co.,*
401 F.2d 833 (2d Cir. 1968) ................................................. 32, 35, 36, 39

*SEC v. Zandford,*
535 U.S. 813 (2002) ................................................. passim

*Smith v. Duff & Phelps,*
891 F. 2d 1567 (11th Cir. 1990) ................................................. 52

*Speed v. Transamerica Corp.*,
  99 F. Supp. 808 (D. Del. 1951)............................................................32, 34

*Steginsky v. Xcelera Inc.*,
  741 F.3d 365 (2d Cir. 2014) ...............................................................34, 35

*Superintendent of Insurance v. Bankers Life & Casualty Co.*,
  404 U.S. 6 (1971) .................................................................................... 32

*Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008) .................................................................... 42

*Tellabs, Inc. v. Makor Issues & Rights Ltd.*,
  551 U.S. 308 (2007) ................................................................................. 42

*The Wharf (Holdings) Ltd. v. United International Holdings, Inc.*,
  532 U.S. 588 (2001) ...........................................................................40, 48

*United States v. O'Hagan*,
  521 U.S. 642 (1997) ................................................................................. 34

## Statutes

15 U.S.C. § 78aa....................................................................................2, 30

15 U.S.C. § 78j......................................................................................2, 32

15 U.S.C. § 78u-4 ..................................................................................... 7

28 U.S.C. § 1331 ....................................................................................... 2

## Rules

Federal Rule of Civil Procedure 12(b)(6).................................................. 7

Federal Rule of Civil Procedure 15.......................................................... 57

Federal Rule of Civil Procedure 9(b).....................................................7, 30

## Treatises

Restatement (Second) of Torts § 533 (1979) ................................................. 50

Restatement (Second) of Torts § 8A (1979) ................................................. 50

## Regulations

17 C.F.R. § 240.10b-5................................................................................32, 33

17 C.F.R. § 240.10b5-1 ................................................................................. 34

Plaintiffs-Appellants Tonya Brown ("Brown"), John Elstad ("Elstad"), Albert Goeken ("Goeken"), Elizabeth Homan ("Homan"), and Jeffrey Sampere ("Sampere") (collectively, "Plaintiffs") respectfully submit this brief in support of their appeal from: (a) the Memorandum Decision and Order, entered on December 12, 2016, which granted the motion to dismiss the amended complaint with prejudice by Defendants-Appellees Cerberus Capital Management, L.P. ("Cerberus"), Cerberus Covis LLC ("Cerberus Covis"), Covis Holdings, L.P. ("Covis Holdings"), Covis Management Investors LLC ("MIP LLC"), Covis US Holdings, LLC ("Covis US"), Covis Management Investors US LLC ("MIP US"), Covis Pharmaceuticals, Inc. ("CPI"), Princeton BioPharma Capital Partners, LLC ("Princeton"), Princeton BioPharma Coinvestment I, L.P., Alexander Benjamin ("Benjamin"), Michael Kelly ("Kelly"), Ethan Klemperer ("Klemperer"), and Michael Wells ("Wells") (collectively, "Defendants")[1]; and (b) the Judgment entered on December 14, 2016.

---

[1] Unless otherwise stated, the abbreviations and collective terms used herein are the same as those used in the Amended Complaint. Of note, herein:

- "Original Equity" refers to the MIP LLC Profits Interests (A-76);
- "New Equity" refers to the MIP US Profits Interests (A-77);
- "Covis US" refers to Covis US Holdings (A-82);
- "Covis" or the "Covis Companies" refers to Covis Holdings, MIP LLC, Covis US, MIP US, and CPI; and
- "Pharma Defendants" refers to Cerberus, Cerberus Covis, Princeton, Princeton BioPharma Coinvestment I, L.P., and the Covis Companies.

(cont'd)

# JURISDICTIONAL STATEMENT

This action arises under § 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b). Section 27 of the Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 conferred subject matter jurisdiction on the United States District Court for the Southern District of New York (Daniels, J.) (the "District Court"). On December 12, 2016, the District Court entered the Memorandum Decision and Order (the "Opinion") dismissing the Amended Complaint with prejudice. (SPA-1-18.)[2] The District Court entered the Judgment on December 14, 2016. (SPA-19-20.) On January 9, 2017, Plaintiffs timely filed the notice of appeal. (A-555.) This Court has appellate jurisdiction under 28 U.S.C. § 1291.

---

[2]     "A-*n*" refers to page "*n*" of the Appendix. "SPA-*n*" refers to page "*n*" of the Special Appendix.

## STATEMENT OF THE ISSUES PRESENTED

1.      Whether the District Court erred by dismissing the Amended Complaint for failure to state a claim for violation of § 10(b).

2.      Whether the District Court erred by denying leave to amend the Amended Complaint.

## STATEMENT OF THE CASE

This action arises out of the Pharma Defendants' insider trading and abuse of their fiduciary duties to Plaintiffs. Plaintiffs agreed to invest their labor at below market salaries for interests in the Covis Companies that the Pharma Defendants promised would be worth millions of dollars. But, by a fraudulent scheme related to a restructuring, the Pharma Defendants duped Plaintiffs into relinquishing valuable interests in the assets owned by the Covis Companies for illusory interests in empty shell companies. Such deception "represent[s] a violent form of speculation which serves no useful purpose except that the [controlling party] always holds the trump card." *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 398 (2d Cir. 1967). The District Court dismissed the Amended Complaint with prejudice, holding that the Pharma Defendants' agents lacked scienter. Plaintiffs appeal from that holding on the grounds that scienter is the only plausible inference to draw from the Pharma Defendants' deceptive devices.

Covis is a network of corporations, partnerships, and limited liability companies conceived by the Pharma Defendants as a short-term, private equity venture. Covis acquired the commercial rights to off-patent pharmaceuticals (the "Rights"), rebranded the products, established the market at the higher price, then sold the Rights for a huge profit. Cerberus was the principal of the Pharma Defendants. It commandeered Covis and masterminded the shell game perpetrated on Plaintiffs.

Plaintiffs were experienced pharmaceutical sales and marketing professionals with strong industry relationships. In exchange for their investment of labor, the Pharma Defendants promised them a share of the appreciation of the Rights. The Pharma Defendants said the Rights would be more than a billion dollars within a few years, and Plaintiffs' share would be worth millions. Plaintiffs agreed to build and manage Covis's distribution network, and received minority, non-controlling equity in two Covis holding companies (the "Original Equity").

In 2013, Cerberus devised a scheme to dupe Plaintiffs into forfeiting their valuable Original Equity for illusory interests in two shell companies that had no assets (the "New Companies"). To effectuate its scheme, Cerberus said it had restructured Covis, ostensibly to separate Covis's Swiss and American operations to reap the benefits of Switzerland's low corporate tax rate. Cerberus said Plaintiffs had to give up their Original Equity for minority, non-controlling interests in the New Companies (the "New Equity").

In their role as Plaintiffs' fiduciaries, the Pharma Defendants represented that the New Equity still entitled Plaintiffs' to a share of the appreciation of the Rights. By a specific formula, the Pharma Defendants confirmed that Plaintiffs' New Equity would be worth millions of dollars. In justifiable reliance on those representations, Plaintiffs agreed to swap their Original Equity for the New Equity and continued working diligently for Covis.

But the Pharma Defendants had defrauded Plaintiffs in violation of § 10(b). Unknown to Plaintiffs, Cerberus had devised the New Companies as mere shells

5

without any material assets. Thus, the New Equity had no intrinsic value and was subject entirely to the Pharma Defendants' discretion. The Pharma Defendants had breached their fiduciary duties as insiders and controlling shareholders of the Covis Companies to take advantage of Plaintiffs, reaping the benefit of their labor without any reciprocal commitment.

On February 26, 2015, when a sale of the Rights was underway, the Pharma Defendants canceled Plaintiffs' vested New Equity in breach of the parties' contracts to conceal their fraudulent conduct. By reference to undisclosed and arbitrary valuation methods, the Pharma Defendants claimed they owed Plaintiffs $290,000. To conceal their fraud, the Pharma Defendants insisted that the Covis venture had failed. They claimed that Covis had debts of $300 million, that the Rights were worth just $478 million, and that Plaintiffs' forfeited Original Equity would not have been worth more than $290,000.

The Pharma Defendants' fraud began to unravel eleven days later when Concordia Healthcare, Inc. ("Concordia") announced that it had bought most of the Rights from Covis for $1.2 billion (the "Concordia Acquisition"). Upon closing the deal, Cerberus and the other Covis investors reaped more than $1 billion in profits. Had the Pharma Defendants honored their promises to Plaintiffs, Plaintiffs' vested New Equity would have been worth $9 million.

Plaintiffs asked for an explanation. In response, the Pharma Defendants stood by their deception. They admitted the New Companies were empty shells,

6

that the New Equity had no real value, and that they never intended to honor their contracts or representations. But they refused to rectify their misconduct.

Plaintiffs filed the Complaint on November 17, 2015 (A-11-73), and the Amended Complaint as of right on February 16, 2016 (A-74-169). Plaintiffs alleged violations of § 10(b) and § 20(a). Plaintiffs alleged that the Pharma Defendants— who were their fiduciaries—made material misrepresentations and omissions in connection with their disposition of Original Equity and acquisition of New Equity that gave rise to a strong inference of scienter.

Defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 (the "PSLRA"). They conceded that their material misstatements and omissions were false when made, but argued that Plaintiffs' reliance was unreasonable. In support of their motion, Defendants submitted documents to the District Court that had not been disclosed to Plaintiffs and two documents from which Defendants removed their arbitrary valuations of Plaintiffs' New Equity and the Rights. Defendants' submissions were improper on a motion to dismiss, and none of them refuted Plaintiffs' factual allegations or legal theories.

At oral argument, the District Court said scienter was apparent. (*See, e.g.*, A-493-495.) Yet, on December 12, 2016, the District Court dismissed the Amended Complaint with prejudice, holding that the allegations did not give rise to a strong inference that the Pharma Defendants' agents had motive to commit fraud. (SPA-1-18.) The Opinion did not address the Pharma Defendants' motive or whether the

7

Pharma Defendants and their agents engaged in conscious misconduct. The District Court declined to exercise supplemental jurisdiction over Plaintiffs' state law claims.

The notice of appeal was timely filed on January 9, 2017. Plaintiffs challenge both the dismissal of the Amended Complaint and the denial of leave to amend, which are final decisions.

## STATEMENT OF FACTS

The Pharma Defendants' fraud was a sophisticated shell game. They abused their fiduciary duties to mislead Plaintiffs for their own profit.

## I. CERBERUS COMMANDEERS THE COVIS COMPANIES

In 2011, Covis's Founders developed a plan to acquire various off-patent pharmaceuticals, rebrand them, establish the market at the higher price, then sell the Rights to a healthcare company for a huge profit. (A-84-85.)

Covis consisted of numerous privately-held corporations, limited liability companies, and limited partnerships both in the United States and abroad. (A-84-85.) In Switzerland, Covis Pharma S.à.r.l. produced the drugs. CPI distributed the drugs in the United States. Covis Holdings was the hub. It owned all Covis Companies, the Rights, and all profits on product sales.[3] (*Id.*)

Cerberus financed the venture, acquired the Rights, and controlled Covis. (A-89-90.) Cerberus owned the clear majority of Covis Holdings shares. (A-89.) Cerberus agents controlled the boards of the Covis Companies. (*Id.*) Cerberus agents worked on site at the Covis Companies. (*Id.*) Three Cerberus affiliates managed Covis Holdings GP, LLC,[4] which directly controlled each Covis company.

---

[3]   Because the Covis Companies are privately-held, Plaintiffs' understanding of Covis's structure is and was based upon the Pharma Defendants' representations and documents they disclosed during Plaintiffs' pre-filing investigation or with Defendants' motion to dismiss. (*See, e.g.*, A-74.)

[4]   The name "Covis Holdings GP, LLC" references two distinct types of legal entities: a partnership and a limited liability company. The Covis Companies (cont'd)

(*See, e.g.*, A-178, A-280, A-286, A-317, A-322, A-331, A-381 & A-411.) Cerberus's legal counsel, Lowenstein Sandler LLP—the firm that represents all Defendants in this action—drafted the documents related to Covis. (*See, e.g.*, A-286.) In its controlling role, Cerberus installed the Founders in executive positions in the Covis Companies. (A-85 & A-89.)

Cerberus kept the vast majority of Covis Holdings shares for itself. (A-89.) It distributed the balance to the other private equity investors and to MIP LLC, a limited liability company that Cerberus controlled. (*Id.*) Via MIP LLC, Cerberus distributed Covis Holdings shares to Covis's executives, managers, and board members. (*See, e.g.*, A-91; *see also* A-220.)

## II. THE PHARMA DEFENDANTS PROMISE PLAINTIFFS MILLIONS OF DOLLARS FOR THEIR INVESTMENT

Because Covis was a short-term venture, Covis needed an experienced sales and marketing team with strong industry relationships. They needed Plaintiffs. Each of them had worked in the industry for decades, and each had prior work experience with the Founders. (A-85-89.)

Over the second half of 2011, the Founders recruited Plaintiffs on behalf of the Pharma Defendants. (*Id.*) They explained that Plaintiffs would be paid below market salaries, but they would receive interests in the appreciation of the Rights, which they expected to be massive. (*Id.*) They promised Plaintiffs their investment

---

had confusing or indistinguishable names that facilitated the Pharma Defendants' shell game.

10

would be worth from the high six figures (for Brown, to whom they promised the least equity) to more than $5 million (for Goeken, to whom they promised the most equity). (A-86.)

Because of the immense investment potential, Plaintiffs left their jobs and joined Covis in late 2011 and early 2012 to comprise the management team for CPI. (A-85-89.) Plaintiffs diligently built Covis's distributions network, using personal equipment and often working from their own homes. (*Id.*) Because of their efforts, Covis had a distribution network in place before Cerberus had completed the acquisition of any Rights. (A-87.) Approximately one year later, to formalize their promise of a share of the Rights, Cerberus issued the 2012 Award Agreements, which granted Plaintiffs their Original Equity, *i.e.*, 125,000 profits interests in MIP LLC and 1.25% of Covis Holdings. (A-91.)

## III. CERBERUS CREATES THE NEW COMPANIES TO DEFRAUD PLAINTIFFS

In 2013, Cerberus implemented a fraudulent scheme to wipe out Plaintiffs' share of the Rights. Cerberus said it had to restructure the Covis Companies to separate the Swiss and American operations to realize greater tax benefits that would enrich all Covis investors (the "Restructuring"). (A-93-103.) Cerberus said it had created the New Companies, *i.e.*, Covis US and MIP US, to effectuate that goal. (*Id.*) As with Covis Holdings, Cerberus controlled Covis US and kept most of the equity. (*See, e.g.*, A-95, A-97, A-347, A-372, A-374, & A-393.) It distributed the

11

balance to the other private equity investors and to MIP US, a limited liability company that Cerberus controlled. (*See, e.g.*, A-94 & A-320.)

According to Cerberus's representations, the Restructuring would only affect Plaintiffs' investment. (A-94.) Cerberus, the private equity investors, and the Founders would retain their interests in Covis Holdings and MIP LLC. (*Id.*) But Cerberus said Plaintiffs would have to relinquish their Original Equity for New Equity to ensure that Covis continued to reap the benefits of low Swiss tax rates. (*Id.*)

As detailed below, in breach of their fiduciary duties and disclosure obligations to Plaintiffs, the Pharma Defendants misled Plaintiffs to think their New Equity, like their Original Equity, was tethered to the appreciation of the Rights and would entitle them to their promised return on investment. (A-93-103.) The Pharma Defendants failed to disclose that the New Companies were empty shells with no assets. They did not disclose that any distribution related to the New Equity would be subject entirely to their arbitrary and unfettered discretion. (A-119-120.)

## IV.    CERBERUS ISSUES ILLUSORY 2013 AWARD AGREEMENTS

To effectuate its fraud on Plaintiffs, Cerberus drafted and issued the 2013 Award Agreements. The 2013 Award Agreements granted Plaintiffs their New Equity: 978,619 MIP US profits interests and 6.11% of the fully-diluted equity of

Covis US. (A-95-96; *see also* A-431, A-444, A-457, A-470 & A-481.)[5] The 2013 Award Agreements specifically described the New Equity as "profits interests," whose value was tied to the appreciation of the New Companies' assets. (*E.g.*, A-76-78, A-95-96, & A-431; *see also, e.g.*, A-434 at § 12 & A-436-439 (discussing the meaning of profits interests).)

But the 2013 Award Agreements were illusory. Because the New Companies had no assets, nothing would appreciate. Cerberus devised the 2013 Award Agreements to give the appearance of substance where substance was lacking.

## V.    IN BREACH OF THEIR FIDUCIARY DUTIES, THE PHARMA DEFENDANTS MISREPRESENT THE 2013 AWARD AGREEMENTS

Plaintiffs noticed the 2013 Award Agreements lacked specific representations regarding the assets owned by the New Companies. (A-100.) Before moving forward with the transaction, Plaintiffs sought confirmation from the Pharma Defendants that the New Equity entitled them to a share of the Rights. (*Id.*)

Because they were controlling shareholders and transacting in their own shares, and because they had access to special facts related to Covis, the Pharma Defendants were Plaintiffs' fiduciaries. Recognizing that relationship of trust and confidence, the 2013 Award Agreement included an "Acknowledgements" clause

---

[5]    For brevity, the Amended Complaint and this brief frequently refer to Plaintiffs' grants and payments in the aggregate. Plaintiffs did not know in any detail what any other Covis investor received.

that required Plaintiffs to affirm that they "had a reasonable opportunity to ask questions of and receive answers from a person or persons acting on behalf of [MIP US] concerning this 2013 Award Agreement and all such questions have been answered to [Plaintiffs'] satisfaction." (*E.g.*, A-433 at § 8.)

To convince Plaintiffs to swap their Original Equity for New Equity, the Pharma Defendants dispatched their agents, Klemperer and Collins, to promote the New Equity to Plaintiffs. (A-100-108.) Klemperer was a Cerberus executive who sat on the board of numerous Covis Companies, including MIP LLC, MIP US, and Covis US. (*E.g.*, A-83, A-95, A-97 & A-100.) Collins was a Founder who also sat on the board of numerous Covis companies, served as the CEO of CPI, and was a significant MIP LLC and Covis Holdings shareholder. (*E.g.*, A-85, A-105; *see also* A-189 (identifying Collins as a MIP LLC board member).) Rather than making accurate and meaningful disclosures, however, they knowingly or recklessly mispresented Plaintiffs' proposed investment in the New Equity. (*E.g.*, 107-108; *see also* A-113-125.)

### A. In Breach of His and the Pharma Defendants' Fiduciary Duties, Klemperer Misrepresents the 2013 Award Agreements

Cerberus webcast a presentation about the Restructuring and the New Equity from its New York headquarters on October 7, 2013. (A-100-103.) Brown, Goeken and Sampere viewed the presentation from a conference room at CPI's headquarters, with Collins and several Cerberus employees. (A-101.) Homan viewed the presentation from her home. (*Id.*)

Klemperer conducted the presentation. He purported to describe the Restructuring and the formal and contractual relationships between the Covis Companies. (A-101.) He assured Plaintiffs that contracts between the Covis Companies tied the value of their New Equity to the appreciation of the Rights. (A-101-102.) Klemperer also promised that the Pharma Defendants would gross-up Plaintiffs' distributions by approximately 31% because of their § 83(b) tax election, a tax election that is only relevant in the context of a company with appreciable assets.[6] (A-102-103; *see also, e.g.*, A-434 at § 12 & A-436-439.)

Klemperer's statements were knowingly false. (*Compare* A-102-103 *to* A-119-121.) Covis Holdings continued to own the Rights exclusively and all value related to the Covis Companies. No contract existed between the Covis Companies that entitled a New Equity holder to any share of them. (*Id.*) The New Equity was illusory, as were his promises. Just one year later, the MIP US board—upon which Klemperer sat—would flatly refuse to gross-up Plaintiffs' distributions, insisting it never intended to do so. (*Id.*)

---

[6] An § 83(b) tax election and accordant gross-up are standard industry practices related to profits interests. *See, e.g.*, Steven B. Gorin "Compensation Issues Involved in Structuring Ownership of Privately-Owned Businesses," at 40 (2011) *available at*, http://www.americanbar.org/content/dam/aba/events/real_property_trust_estate/symposia/2011/rpte_symposia_2011_m2867_te_section_83_fundamentals.authcheckdam.pdf (last visited February 21, 2016).

Plaintiffs asked for copies of Klemperer's presentation to better understand the proposed transaction. The Pharma Defendants refused. (A-103.)

## B. In Breach of their Fiduciary Duties, the Pharma Defendants Distribute Opaque Equity Schedules

In connection with distribution of the 2013 Award Agreements and Klemperer's presentation, the Pharma Defendants distributed abstract and cryptic CPI Equity Schedules (the "Equity Schedules"). (A-104.) Each Equity Schedule had two rows. One referred to a Plaintiff's "Prior Equity Allocation," *i.e.*, their Original Equity. (*E.g.*, A-169.) The other referred to a Plaintiff's "New Equity Allocation," *i.e.*, their New Equity. The Equity Schedules stated each Plaintiffs' "% Interest of CPI Mgmt Interests": Brown had 6.6%, Elstad, Homan, and Sampere had 16.4%, and Goeken had 26.3%. (A-104 & A-169; *see also* A-425-429.) But the phrase "CPI Mgmt Interests" was undefined. (A-104.) The Equity Schedules did not reference the Rights or the gross-up. (A-425-429.) And they did not specify what the New Companies owned. (*Id.*) Standing alone, the Equity Schedules disclosed no material information.

## C. In Breach of His and the Pharma Defendants' Fiduciary Duties, Collins Misrepresents the 2013 Award Agreements

After reviewing the 2013 Award Agreements and the Equity Schedules, and after listening to Klemperer's presentation, Plaintiffs remained concerned and sought confirmation that the 2013 Award Agreements were not illusory. In

response to their inquiries, Collins explained the proposed transaction to Plaintiffs on behalf of the Pharma Defendants. (A-104.)

On October 7 and 8, 2013, Collins represented that, via the New Companies, the Pharma Defendants had allocated 3.5% of the appreciation of the Rights to CPI Management, *i.e.*, to Plaintiffs. (A-105-108.) He said that the "'% Interest of CPI Mgmt Interests" stated on the Equity Schedules equaled each Plaintiffs' percentage of the 3.5%. (*Id.*) According to Collins, Plaintiffs had been granted 82.1% of CPI Mgmt Interests, meaning they had been granted 2.87% of the appreciation of the Rights. (*Id.*) Collins reiterated that the Pharma Defendants would gross-up Plaintiffs' distributions. (*Id.*)

To support his representations, Collins walked each Plaintiff through a potential liquidation event, and, in one instance, wrote the calculations on Sampere's Equity Schedule. (*Id.*; *see also* A-169.) He said Covis's debt and preferred equity equaled approximately $350 million at the time. So, if Covis sold the Rights for $650 million, Plaintiffs' fully-vested New Equity would be worth more than $11 million, *i.e.*, 2.87% × $300 million × 131%. (A-105; *see also* A-169.) And if the Rights sold for $1 billion, Plaintiffs' fully-vested New Equity would be worth approximately $25 million, *i.e.*, 2.87% × $650 million × 131%. (A-106.)

Collins's representations dovetailed with the representations the Founders had made regarding Plaintiffs' Original Equity. (A-85-89.) For example, when recruiting Goeken, Collins said he would receive more than $5 million. (A-86.) Collins promised Goeken that his New Equity would be worth more than $5

million. (A-106.) Like Klemperer, Collins reassured Plaintiffs that the New Equity protected their original investment. (*Id.*) And, like Klemperer, his statements were knowingly or recklessly false. (*Compare* A-103-108 *to* A-119-121; *see also* A-124-125.)

## VI.  PLAINTIFFS EXECUTE THE 2013 AWARD AGREEMENTS

In justifiable reliance on the representations by their fiduciaries, Plaintiffs executed their 2013 Award Agreements. (A-107.) Collins countersigned each 2013 Award Agreement on behalf of MIP US. (A-430-487.)

With that, Plaintiffs became victims of the Pharma Defendants' fraudulent scheme. Presented with confusing and incomplete documents complemented by misrepresentations by the Pharma Defendants' agents upon whom they were contractually required to rely, Plaintiffs forfeited their Original Equity, which entitled them to, among other things, 1.25% of the Rights. They continued working at CPI for below market salaries under the false impression, fostered by the Pharma Defendants, that their New Equity guaranteed them 2.87% of the Rights. But their New Equity guaranteed them nothing.

## VII.  THE PHARMA DEFENDANTS CONCEAL THEIR FRAUD WHILE SELLING THE RIGHTS FOR MORE THAN $1 BILLION IN PROFIT

### A.     The Pharma Defendants Cancel Most of Plaintiffs' Unvested New Equity in Bad Faith

As planned, the value of the Rights began to climb dramatically over the course of 2014. (*E.g.*, A-86; *see also* A-113 & A-122-23.) To conceal that the 2013 Award Agreements were illusory and manufacture false justifications to keep the

anticipated profits for themselves, the Pharma Defendants employed various machinations to cancel Plaintiffs' unvested New Equity. (A-96-97.) They set impossible performance targets. (A-97.) They terminated Plaintiffs when a sale of the Rights was on the horizon. (A-109-113.) They immediately re-hired Goeken to a part-time position, but, when he resigned two months later, they failed to disclose they were in merger negotiations (the "Summer 2014 Merger Negotiations"). (A-109 & A-111.) Thus, by the end of 2014, when the Pharma Defendants were on the cusp of selling the Rights for a massive profit due to Plaintiffs' efforts, they had artfully terminated Plaintiffs so that only 23.5% of their New Equity had vested. (*Id.*)

## B. The Pharma Defendants Issue Illusory Repurchase Agreements to Cancel Plaintiffs' Vested New Equity

On December 31, 2014, the Pharma Defendants issued Repurchase Agreements purporting to call Plaintiffs' vested New Equity. (A-113.) The Repurchase Agreements stated that the MIP US board had valued Plaintiffs' vested New Equity at $290,332. (A-115.) The Repurchase Agreements did not attach any valuation materials. (*Id.*)

Though the Repurchase Agreements feigned compliance with the 2013 Award Agreements, they in fact repudiated those agreements and all representations made in connection with them. (A-113-124.) They made no reference to the Rights or the gross-up. (A-115-116.) Though Defendants' call right was subject to a 30-day Option Period, Defendants purported to call Brown's, Elstad's, and Goeken's

vested New Equity more than 100 days after the Option Period expired. (*Compare* A-110-111 & A-113 *to* A-403-404 at § 8.2(b) & 415.) Though they purported to perform a pre-existing duty, the Repurchase Agreements sought extensive, one-sided releases from Plaintiffs for the Pharma Defendants. (A-114.) And they misstated and unilaterally modified the closing procedures. (A-98 & A-117.) The Repurchase Agreements evidenced overreaching and was yet another illusory contract issued by the Pharma Defendants.

### C. The Pharma Defendants Admit the New Equity Was Illusory

Six weeks after they issued the Repurchase Agreements, CPI delivered letters to Plaintiffs on February 19, 2015 (the "February 19 Letters").[7] The February 19 Letters claimed Defendants had delayed canceling Plaintiffs' vested New Equity so they could generate valuations (the "Valuations"). (A-119.)

The Pharma Defendants issued the Valuations to conceal their fraud in connection with the 2013 Award Agreements and New Equity.[8] The Valuations claimed the value of New Equity was tied solely to a share of Covis's profits on

---

[7]    Evidencing Defendants' failure to observe any corporate formalities, the February 19 Letters issued on CPI letterhead though Plaintiffs' New Equity related to MIP US and Covis US. (*See* A-489.)

[8]    Defendants removed the Valuation from the copy of the February 19 Letter they submitted to the District Court in support of their motion to dismiss. (*See* A-489.)

(cont'd)

product sales over a nine-month period (the "Termination Payment") (A-120.) That valuation method had never been disclosed to Plaintiffs, and had been repeatedly and affirmatively misrepresented by the Pharma Defendants. (*E.g.*, 95-108.)[9] The Valuation also confirmed that the New Companies did not own any share of the Rights or any other appreciable asset. (*See* A-119-121.) The New Equity had no real value.

The February 19 Letters said the Pharma Defendants would cancel Plaintiffs' New Equity regardless of their consent. (A-303; A-489.) On February 26, 2015, in bad faith breach of the 2013 Award Agreements and premised on the arbitrary and false Valuations, the Pharma Defendants canceled Plaintiffs' New Equity and issued checks totaling $290,332 ($17,298 to Brown, $43,224 to Elstad, $69,190 to Goeken, and $80,310 each to Homan and Sampere). (A-122.)

---

[9]    Underscoring its arbitrariness, the valuation method contradicted the terms of the MIP US Operating Agreement, which governed the 2013 Award Agreements. (*See, e.g.*, A-431.) The MIP US Operating Agreement said the Termination Payment was merely a bonus for current employees and would not be used to value the New Equity under any circumstances. (*See* A-391 at § 4.1(b)(vi)(A); *see also* A-390 at § 4.1(a)(iii); *cf.* A-339 at § 4.3 (similar statement in Covis US Operating Agreement).)

(cont'd)

### D. Kelly and Benjamin Misrepresent the Rights are Worth $478 Million to Divert Plaintiffs' Attention from the Pharma Defendants' Fraud

In January and April 2015, Plaintiffs contacted Kelly and Benjamin to discuss why the Pharma Defendants were not honoring their contracts and representations. (A-115-116 & A-123.) Cerberus had replaced Collins with Kelly in early 2014. (A-48, A-108.) Benjamin was a Cerberus executive who sat on the board of numerous Covis Companies. (A-83.)[10]

During those conversations, Kelly and Benjamin tried to divert Plaintiffs from investigating and uncovering the Pharma Defendants' fraud. They claimed Covis Holdings had $300 million in debt, and the Rights were worth $478 million, leaving just $180 million for Covis Holdings's investors. (A-123.) They claimed, if Plaintiffs had kept their Original Equity, the Pharma Defendants would have diluted and discounted it, whereby Plaintiffs' share only would have been worth – quite conveniently—$290,000. (*Id.*) Based on those assumptions, they claimed Plaintiffs had not been misled: they received for their New Equity what they would have received for their Original Equity.

Kelly's and Benjamin's explanation made no sense. Klemperer and Collins had promised Plaintiffs that their New Equity entitled them to 2.87% of the

---

[10] Demonstrating the complete entanglement of Cerberus and the Covis Companies, Benjamin sat on the MIP US board and signed the MIP US Operating Agreement on behalf of both Covis US and Covis Holdings GP. (A-411.)

appreciation of the Rights and a 31% gross-up. (A-100-108.) Because 23.5% of Plaintiffs' New Equity had vested, they should have received at least $1.6 million (23.5% × 2.87% × $180 million × 131%). (A-117.) And they had always been told the Rights would sell for hundreds of millions more. (*E.g.*, A-105-106.)

While repudiating Klemperer's and Collin's representations that had induced Plaintiffs' to acquire the New Equity, Kelly and Benjamin also failed to disclose highly material information. They did not disclose that Valeant had bid $800 million for the Rights in mid-December 2014. (A-113 & A-117.) They did not disclose that Concordia bid $1.2 billion for all the Rights in mid-January 2015. (A-118.) And they did not disclose that, during negotiations with Concordia, Cerberus insisted on keeping three of the Rights because they had significantly more potential to appreciate.[11] Thus, by the Pharma Defendants own theory, if they had not duped Plaintiffs into relinquishing their Original Equity in 2013, Plaintiffs still should have

---

[11]    These facts were revealed recently, on December 6, 2016, when Banks Bourne, CEO of Bourne Partners, gave a presentation at the North Carolina Biotechnology Center, entitled, "From Startup to a Billion Dollar Exit: 'The Covis Story.'" Bourne Partners is one of private equity investors in Covis, though it was not named as a defendant. (*E.g.*, A-156.) Bourne said the Concordia negotiations began during the J.P. Morgan Annual Healthcare Conference held in San Francisco, California, on January 12-15, 2015, six weeks prior to the cancelation of Plaintiffs' New Equity. He said Concordia offered $1.2 billion for the entire portfolio, but Cerberus and the private equity companies negotiated to keep three of the products with the most potential.

(cont'd)

received far more than $290,000 because 23.5% of Plaintiff's Original Equity would have been worth approximately $3.8 million (23.5% × 1.25% × $1 billion × 131%). (A-91.)[12]

In other words, the Pharma Defendants had not only duped Plaintiffs into illusory investment contracts, but subsequently misrepresented what Plaintiffs would have received under their original investment contracts to conceal their fraud.

### E. Concordia Announces It Acquired Most of the Rights for $1.2 Billion

Defendants' efforts to conceal the fraud began to unravel on March 9, 2015. Just eleven days after the Pharma Defendants canceled Plaintiffs' New Equity, Concordia publicly announced that it was purchasing eighteen of the Rights for $1.2 billion. (A-122.) Cerberus and the other Covis investors reaped more than $1 billion in profits, in large part because of Plaintiffs' efforts.

Plaintiffs, on the other hand, had fallen prey to the Pharma Defendants' fraud. Based on the Pharma Defendants promises and representations, their vested New Equity should have been worth approximately $9 million (23.5% × 2.87% ×

---

[12]    The gross-up is an industry standard related to profits interest and Plaintiffs took a § 83(b) tax election with respect to their Original Equity. (A-220-277.) Thus, they would have been entitled to a gross-up with respect to their Original Equity as well.

(cont'd)

$1 billion × 131%). (A-124.)[13] Without justification and in bad faith, the Pharma Defendants simply withheld Plaintiffs' promised share for themselves.

## VIII. PROCEEDINGS BELOW

Plaintiffs filed the Complaint on November 17, 2015 (A-11-73), and the Amended Complaint as of right on February 16, 2016, alleging, *inter alia*, violations of § 10(b) and § 20(a) (A-74-169.)

Defendants moved to dismiss the Amended Complaint on March 15, 2016. Defendants—a group that includes Klemperer—argued that they never intended to honor Klemperer's or Collins's representations. (*E.g.*, ECF No. 42 at 11-13.) They acknowledged that the New Companies had no assets beside the immaterial and undisclosed Termination Payment. (*Id.* at 7.) They acknowledged they had used the misleading $478 million valuation of the Rights to convince Plaintiffs that their Original Equity would have had minimal value. (*Id.*) But they insisted Plaintiffs had no claim because reliance upon Klemperer's and Collins's specific representations was unreasonable. (*Id.* at 11-14.) They insisted the balance of their alleged misconduct fell within their absolute discretion. (*Id.*)

In support of their motion, Defendants submitted copies of the MIP LLC Operating Agreement, the Master Restructuring Agreement, and MIP US Operating Agreement. (A-174-218, A-279-375, & A-377-423.) The Amended

---

[13] Their entire grant of New Equity should have been worth approximately $37.5 million (2.87% × $1 billion × 131%).

Complaint alleged, however, that those documents had not been fully disclosed to Plaintiffs. (A-94 & A-104.) Defendants also submitted an incomplete copy of their February 19 Letter to Brown from which they removed the arbitrary Valuation of her New Equity premised on the Termination Payment. (A-489.)

In opposition, Plaintiffs argued that reliance on the Pharma Defendants was not only reasonable, but necessary. (ECF No. 46 at 10-13.) With respect to scienter, Plaintiffs noted that Defendants conceded Klemperer's and Collins's representations were knowingly false when made. (*Id.* at 18-19.) They further argued the Pharma Defendants had motive and opportunity, and had abused their fiduciary relationship to realize concrete benefits. (*Id.* at 14-19.) In closing, Plaintiffs requested leave to amend if the District Court granted the motion. (*Id.* at 25.)

On June 14, 2016, the District Court heard oral arguments. (A-491-516.) In response to Defendants' arguments regarding reliance, the District Court noted that scienter was the only plausible inference to draw from the Pharma Defendants' deception. (*E.g.*, A-492-493.) The next day, the District Court *sua sponte* directed the parties to attend a settlement conference scheduled for August 16, 2016.

Two weeks after oral arguments, Defendants submitted a letter to the District Court that attached an incomplete copy of a letter, dated November 10, 2015, they had sent to Plaintiffs' counsel (the "November 10 Letter"). Defendants' submission created chaos. They disputed factual allegations, which is improper at the pleading stage. (*See* A-541-542.) They removed the exhibits from their

26

November 10 Letter that included valuations of the Rights. (*See* A-541-556.)[14] They misstated the oral argument transcript. (*Compare* A-541-542 *to* A-532-535.) They did not file their letters on the docket.[15]

Their submissions were also counterproductive. Notably, Defendants' November 10 Letter admitted that Defendants had valued the New Equity in an arbitrary manner. (*See, e.g.*, A-548 (admitting that, contrary to the Pharma Defendants' contracts and representations, the undisclosed Termination Payment was "***the*** method contemplated by" the Pharma Defendants to value Plaintiffs' New Equity (emphasis in original)).) The November 10 Letter confirmed that there were genuine issues of fact related to Plaintiffs' allegations.

The District Court twice adjourned the settlement conference, first to October 18, 2016, and then to December 13, 2016. (*See* ECF Nos. 55 & 56.)

One day before the settlement conference, on December 12, 2016, the District Court dismissed the Amended Complaint with prejudice. The Opinion held that the allegations did not give rise to a strong inference that the Pharma Defendants' agents had motive to commit fraud. (SPA-12-17.) The Opinion did

---

[14] The November 10 Letter was the third incomplete document that Defendants had submitted to the District Court. (*See, e.g.*, A-533 n.2 (noting the documents were incomplete); *see also* ECF No. 46 at 14 n.4.)

[15] To ensure that all the parties' correspondence to the District Court was in the record, Plaintiffs attached Defendants' submissions to their response and filed them on ECF. (*See* A-536-556.)

not address whether the Pharma Defendants had motive and opportunity. The Opinion also did not address whether the Pharma Defendants' or their agents engaged in conscious misconduct.

The District Court noted that it could consider documents integral to the pleading, but did not say which documents submitted by Defendants it had considered or how it had considered them. (SPA-8 n.15.) In fact, the District Court appeared to rely on Defendants' November 10 Letter to resolve factual disputes in Defendants' favor (*see* SPA-16-17), though it had neither converted Defendants' motion to one for summary judgment nor given Plaintiffs the opportunity supplement the record. Indeed, if it had, Plaintiffs would have submitted additional evidence, including the true and complete copies of Defendants' Letters with their arbitrary and misleading valuations attached.

The District Court dismissed Plaintiffs' § 10(b) and § 20(a) claims with prejudice. The District Court declined to exercise supplemental jurisdiction over Plaintiffs' state and common law claims. This appeal followed.

## STANDARDS OF REVIEW

The Second Circuit reviews *de novo* the District Court's decision to dismiss a complaint for failure to state a claim, accepting as true all factual allegations and drawing all reasonable inferences in the plaintiff's favor. *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 169 (2d Cir. 2015). The District Court's decision to deny leave to amend is reviewed for abuse of discretion. *Id.* at 169.

# SUMMARY OF ARGUMENT

The Court should reverse the District Court's decision and reinstate the Amended Complaint in its entirety or, in the alternative, grant leave to amend. Plaintiffs' allegations of federal securities fraud are pled in sufficient detail to satisfy Rule 9(b) and the PSLRA, and give rise to a strong inference of scienter.

*First*, when deceiving Plaintiffs to invest in empty shell companies, the Pharma Defendants employed insider trading and sham companies, in addition to material misrepresentations. The Pharma Defendants were knowledgeable insiders transacting in their own shares. They had an absolute duty to convey all material information to Plaintiffs, but, instead, they omitted critical information and misrepresented the facts, inducing Plaintiffs to relinquish their share of the Rights for illusory New Equity. Plaintiffs, by necessity and contract, relied upon the Pharma Defendants' fraud, which caused their loss.

Contrary to the District Court's holding, the allegations regarding the Pharma Defendants' deceptive devices give rise to a strong inference of scienter. The Pharma Defendants and their agents had motive and opportunity. In breach of their fiduciary duty of full disclosure, they misrepresented and omitted material information so they could recoup Plaintiffs' share of the Rights and receive the benefit of Plaintiffs' continued investment of labor without owing Plaintiffs anything in return. The Pharma Defendants' misconduct was also conscious: despite having an affirmative duty to disclose all material information, and despite having sole custody and control of that material information, they misrepresented

material facts and later admitted they harbored a secret intention not to be bound by their representations. The circumstantial evidence confirms their misconduct was intentional, because it is implausible that the Pharma Defendants innocently misrepresented that the New Companies owned a share of the Rights when they owned nothing at all. Moreover, Cerberus and the other Covis investors realized more than $1 billion in profits on the Concordia Acquisition. There was no reason for them to repudiate their promises beyond the fact that they never intended to honor them.

*Second,* when dismissing the Amended Complaint, the District Court erred because it did not draw all reasonable inferences in Plaintiffs' favor. Rather, the District Court appears to have considered documents outside the Amended Complaint without giving Plaintiffs the opportunity to supplement the record. In any event, the documents submitted by Defendants evidence that Plaintiffs' allegations are highly plausible and raise genuine issues of material fact.

*Finally*, the District Court abused its discretion by denying leave to amend. Leave to amend should be freely given, particularly when a complaint is dismissed pursuant to the heightened pleading requirements of Rule 9(b) and the PSLRA. The District Court, however, offered no reason for denying leave, and its criticisms of the Amended Complaint could easily be remedied.

# ARGUMENT

## I.   THE AMENDED COMPLAINT STATES A VIOLATION OF SECTION 10(B)

The Pharma Defendants misconduct is precisely what § 10(b) was designed to prohibit. Section 10(b) makes it "unlawful for any person . . . to use or employ, in connection with the purchase or sale of any securities . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j; *see also* 17 C.F.R. § 240.10b-5 ("Rule 10b-5"). Section 10(b) was enacted "'to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *SEC v. Zandford*, 535 U.S. 813, 819 (2002). It ensures that all investors are subject to the same risks, *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 852 (2d Cir. 1968), and protects "persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting," *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 494 (S.D.N.Y. 2005) (quotation marks omitted). Section 10(b) prohibits all schemes related to securities transactions, whether garden variety fraud or novel forms of deception. *A.T. Brod*, 375 F.2d at 397.

To achieve Congress's goal of protecting trust relationships, § 10(b) "must be read flexibly, not technically and restrictively." *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 11 (1971). Under § 10(b), the SEC promulgated Rule 10b-5, which has three "mutually supporting and not mutually exclusive" parts. *Speed v. Transamerica Corp.*, 99 F. Supp. 808, 829 (D. Del. 1951); 17 C.F.R. § 240.10b-5.

Typically, courts analyze affirmative misrepresentations in connection with securities transactions pursuant to Rule 10b-5(b), but Rules 10b-5(a) and (c) "are not so restricted." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 152-53 (1972); *In re Parmalat*, 376 F. Supp. 2d 472 at 502. Courts apply Rules 10b-5(a) and (c) to analyze claims of fraudulent schemes such as the insider trading. *See Chiarella v. United States*, 445 U.S. 222, 225-26 (1980).

To plead a fraudulent scheme in violation of Rules 10b-5(a) and (c), a plaintiff must allege that a defendant (1) committed a deceptive act, (2) with scienter, (3) in connection with a securities transaction, and that (4) defendant's actions caused the plaintiff's injuries. *See Zandford*, 535 U.S. at 821-25; *see also In re Parmalat*, 376 F. Supp. 2d at 492.

The District Court held that Plaintiffs had failed to raise a plausible inference of scienter. (SPA-12-17.) The Pharma Defendants' scienter is discussed in detail (*see infra* pp. 42-53), but the argument begins with a discussion of their deceptive devices— insider trading and sham companies—and how those deceptive devices were material and caused Plaintiffs' loss. After scienter, the argument turns to damages.

## A. The Pharma Defendants Used Deceptive Devices to Defraud Plaintiffs

The Pharma Defendants deceived into swapping their share of the Original Equity, which entitled them to a specific share of the Rights, for illusory New Equity, which entitled them to nothing more than arbitrary payments subject to the

Pharma Defendants' absolute discretion. Such deceptive conduct "represent[s] a violent form of speculation which serves no useful purpose except that the [controlling party] always holds the trump card." *A.T. Brod & Co. v. Perlow*, 375 F.2d 393, 398 (2d Cir. 1967). To achieve their goal, the Pharma Defendants employed insider trading and sham companies. Both are well-recognized deceptive devices that violate § 10(b).

### 1. The Pharma Defendants Engaged in Insider Trading

Trading on the basis of material, non-public information despite a duty to disclose, *i.e.*, insider trading, is a well-established deceptive device in violation of § 10(b). *Steginsky v. Xcelera Inc.*, 741 F.3d 365, 370 (2d Cir. 2014); *see also United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997); *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 179 (2d Cir. 2001); 17 C.F.R. § 240.10b5-1.

### a. The Pharma Defendants Were Plaintiffs' Fiduciaries with a Duty to Disclose

A duty to disclose arises from a relationship of trust or confidence. *See Castellano*, 257 F.3d at 179; 17 C.F.R. § 240.10b5-1. Federal courts have long recognized a fiduciary relationship between insiders and shareholders because "of the 'necessity of preventing a corporate insider from . . .[taking] unfair advantage of the uninformed minority stockholders.'" *Chiarella,* 445 U.S. at 228-29 (quoting *Speed*, 99 F. Supp. at 828-29). This "is not a novel twist of the law." *Id.* at 228. Insiders with a fiduciary duty of disclosure include, but are not limited to, directors, officers, controlling shareholders and companies that transact in their own shares. *Steginsky*,

741 F.3d at 370; *see also Castellano*, 257 F.3d at 179; *Powers v. British Vita, P.L.C.*, 57 F.3d 176, 189 (2d Cir. 1995); *Jordan v. Duff & Phelps*, 815 F.2d 429, 435 (7th Cir. 1985); *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 849 (2d Cir. 1968).

Here, the Pharma Defendants were insiders, controlling shareholders, and companies transacting in their own shares with Plaintiffs, who were minority and non-controlling shareholders. Cerberus controlled all the privately-held Covis Companies by its executives on their boards and Covis Holdings GP. (*E.g.*, A-89-90, A-95, A-97, A-381, & A-411.) Cerberus owned most Covis Holdings and Covis US equity. (A-89-90, A-372, & A-374.) Cerberus devised the Restructuring. (*E.g.*, A-84-85, A-89-90, A-93-100.) Cerberus orchestrated the transactions that caused Plaintiffs to swap their Original Equity and share of the Rights for their New Equity in empty shell companies. (A-93-108.) Cerberus, the Covis Companies, their agents and directors, stood on both sides of the deal and had actual knowledge of all material information related to Plaintiffs' investment, which was non-public. (*Id.*) As the Second Circuit held in *Steginsky*, such allegations are more than sufficient to allege that the Pharma Defendants are insiders with a duty to disclose under federal law. *See* 741 F.3d at 370.

Indeed, when inducing Plaintiffs into the trades, the Pharma Defendants formalized their relationship of trust and confidence in the 2013 Award Agreements, which required Plaintiffs to rely on the Pharma Defendants' representations regarding the New Companies and the New Equity. (*E.g.*, A-433 at

§ 8.) Thus, both by federal common law and contract, the Pharma Defendants were Plaintiffs' fiduciaries with a duty to disclose all material information.

> ### b. The Pharma Defendants' Breached Their Fiduciary Duties by Omitting and Misrepresenting Material Information

Because the Pharma Defendants were insiders and Plaintiffs' fiduciaries, they had a duty to communicate clearly and unambiguously all material information to Plaintiffs before entering into the transaction. *See Castellano*, 257 F.3d at 179; *see also Chiarella*, 445 U.S. at 226-29; *Texas Gulf Sulphur*, 401 F.2d at 848. Plaintiffs had a right to know whether the Pharma Defendants stood to gain from the swap. *See Affiliated Ute*, 404 U.S. at 153.[16]

---

[16]  As the Supreme Court has noted, the distinction between misrepresentations and omissions dissolves when the defendant has an affirmative duty to disclose material information. *Zandford*, 535 U.S. at 823; *Affiliated Ute*, 406 U.S. at 153-54. Because the Pharma Defendants had fiduciary obligations to disclose all material information, Plaintiffs allegations best conform to an insider trading theory. That said, the numerous affirmative misrepresentations by the Pharma Defendants that Plaintiffs allege in detail (*e.g.*, A-93-108) also satisfy the elements of a traditional Rule 10b-5(b) claim, which requires a plaintiff to allege that the defendant "(1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." *Emps.' Ret. Sys. v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015).

Here, the Pharma Defendants failed to meet their fiduciary obligations in every respect by omitting and misrepresenting all material information related to Plaintiffs' investment in New Equity.

In breach of their fiduciary duties, the Pharma Defendants failed to disclose that the 2013 Award Agreements were illusory contracts. (A-93-100.) They failed disclose the New Companies had no material assets and the New Equity had no value. (*E.g.*, A-119-121.) They failed to disclose they secretly intended to value the New Equity by reference to the undisclosed Termination Payment. (*See* A-93-108, A-118-122 & A-431-487). They failed to disclose they had untethered Plaintiffs' investment from the skyrocketing value of the Rights. (*Id.*) And they failed to disclose that they, and they alone, stood to gain from swapping the Original Equity, and its share of the Rights, for New Equity, and its share of nothing. Plaintiffs had the right to know they were forgoing actual contractual rights in exchange for illusory benefits left to the Pharma Defendants' absolute discretion.

In combination with their material nondisclosures, the Pharma Defendants also made affirmative misrepresentations. By the express terms of the 2013 Award Agreements they affirmatively misrepresented that New Equity was non-illusory and related to actual, appreciable assets—going so far as to require Plaintiffs to file § 83(b) forms. (A-93-100; *see also* A-431-487.) They dispatched Collins and Klemperer to affirmatively misrepresent that the New Equity entitled Plaintiffs to 2.87% of the appreciation of the Rights and that the Pharma Defendants would, consistent with industry practice, gross-up Plaintiffs' distributions by 31%. (A-100-

108.) The Pharma Defendants subsequently admitted that they never intended to honor those representations. (*E.g.*, A-119-121.)

All material information regarding the New Equity was in the Pharma Defendants' possession and could have been clearly and easily communicated to Plaintiffs, but the Pharma Defendants did not do so. And it resulted in Plaintiffs being deprived of their bargained for investment and a windfall to the Pharma Defendants. *Cf. Zandford*, 535 U.S. at 822; *see also Bankers Life*, 404 U.S. at 12. Accordingly, Plaintiffs have alleged an insider trading scheme by the Pharma Defendants.

### 2. The Pharma Defendants Created Sham Investments

Related to their insider trading, the Pharma Defendants securitized shell companies with no assets, which is a deceptive device because it creates the appearance of substance where it is lacking. *See In re Parmalat*, 376 F. Supp. 2d at 499-504; *Filler v. Lernout (In re Lernout & Hauspie Sec. Litig.)*, 236 F. Supp. 2d 161, 172-73 (D. Mass. 2003); *cf. Zandford*, 535 U.S. at 824-25 (holding that broker's actions in establishing phony escrow accounts and using the proceeds for his own purposes was an unlawful scheme within the meaning of § 10(b)).

Here, the deception is inherent in the Pharma Defendants' conduct. They securitized the New Companies and issued the 2013 Award Agreements that granted Plaintiffs 978,619 MIP US profits interests and 6.11% of Covis US. (A-93-100; *see also* A-431-87.) The 2013 Award Agreements said Plaintiffs' New Equity

entitled them to the appreciation of those companies. (A-93-100; *see also* A-431-87.) The Pharma Defendants designed the 2013 Award Agreements to give Plaintiffs the false impression that New Equity entitled them to the appreciation of the Rights. (A-93-100.) Indeed, the Pharma Defendants dispatched their agents to confirm just that. (A-100-108.) But, in fact, the New Companies had no material assets, which served the Pharma Defendants effort to recoup Plaintiffs' share of the Rights and continue reaping the benefit of Plaintiffs' investment without any reciprocal commitment. (A-119-121.)

### B.   Plaintiffs Allege Materiality and Causation

That the Pharma Defendants' deceptive devices coincided with securities transactions is self-evident. *See Zandford*, 535 U.S. at 822. Materiality and causation are equally straightforward, and are discussed briefly below.

### 1.   The Pharma Defendants' Deception Related to Material Facts

For an undisclosed fact to be material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Castellano*, 257 F.3d at 180 (quotation marks omitted). "Material facts include those that 'affect the probable future of the company and [that] may affect the desire of investors to buy, sell, or hold the company's securities.'" *Id.* (quoting *Texas Gulf Sulphur*, 401 F.2d at 849).

Here, the misrepresented and omitted facts related to the assets owned by the New Companies, the value of the New Equity, and whether the 2013 Award Agreements were illusory. (A-93-108 & A-431-487.) The Pharma Defendants misrepresented and failed to disclose that the New Companies owned nothing, that the New Equity had no relation to the Rights or any asset of appreciable value, and that the value of Plaintiffs' investment depended entirely on the Pharma Defendants' unfettered discretion. (A-119-121.) Whether an investment contract is real or illusory would undoubtedly affect a reasonable investor's investment decision. *Cf. The Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 532 U.S. 588, 596 (2001) ("Since [the issuer] did not intend to honor the option, the option was, unbeknownst to [the purchaser], valueless.").

## 2. The Pharma Defendants' Deception Caused the Transactions

To establish transaction causation or reliance, the plaintiff must allege that "but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction." *Castellano*, 257 F.3d at 186.

Here, reliance is indisputable. Because the Pharma Defendants abused their fiduciary duties to Plaintiffs by failing to give honest and complete information regarding the New Equity, reliance is presumed. *See Affiliated* Ute, 406 U.S. at 154. Moreover, Plaintiffs relied on the materially misleading terms of the 2013 Award Agreements and § 83(b) forms. (A-431-487.) And they were required by contract to rely upon the Pharma Defendants' representations (*e.g.*, A-433 § 8), which is

precisely what they did (A-107 & A-126). Plaintiffs' diligently sought clarifying information from the Pharma Defendants regarding the non-public Covis Companies, which the Pharma Defendants either withheld or misrepresented. (A-93-108.) Reliance was Plaintiffs' only choice. And it was actual. If not for the Pharma Defendants' omissions and misrepresentations, Plaintiffs would have rejected the 2013 Award Agreements and sought further concessions or clarifying representations. (A-100, A-107-108 & A-126.)

### 3. The Pharma Defendants' Deception Proximately Caused Plaintiffs' Loss

Loss causation is shown by allegations that the misrepresented or omitted information relates to the investment quality of the security and made the investment more disposed to suffer the alleged harm. *See Castellano*, 257 F.3d at 185; *see also Loreley*, 797 F.3d at 186.

The Pharma Defendants represented that the appreciation of the New Companies and value of the New Equity related to the appreciation of the Rights. (A-93-108, A-125-126, & A-431-487.) But the New Companies had no material assets whatsoever. (A-107-108, A-119-121, & A-125-126.) The undisclosed risk that Plaintiffs' 2013 Award Agreements were illusory and that their distributions were subject entirely to the Pharma Defendants' self-interest and caprice rather than actual contractual obligations was precisely the risk that materialized to cause Plaintiffs' loss. (A-115-122 & A-129.) Had the truth been disclosed, Plaintiffs would have refused to relinquish their Original Equity or renegotiated the 2013 Award

41

Agreements to ensure their New Equity had substance. (*E.g.*, A-126.) The Pharma Defendants' deception was designed expressly to deprive Plaintiffs of that choice.

### C. The Allegations Give Rise to a Strong Inference of Scienter

With the deceptive devices, materiality, and causation established, Defendants' scienter is apparent.

To state a violation of § 10(b), the allegations must give rise to a strong inference of scienter. 15 U.S.C. § 78u-4(b)(2). "The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint adequately pleads scienter if a reasonable person would deem the inference of scienter both "cogent" and "at least as compelling as any opposing inference one could draw from the facts alleged" *Id.* at 324; *see also Loreley*, 797 F.3d at 174; *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 711 (7th Cir. 2008).

A plaintiff is not required to plead scienter against a specific agent. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *Makor*, 513 F.3d at 708. When the defendant is a company, a plaintiff pleads scienter by alleging facts sufficient to create a strong inference that "someone whose intent could be imputed to the corporation acted with the requisite scienter" or the statements "would have been approved by corporate officials sufficiently

42

knowledgeable about the company to know" that those statements were misleading. *Loreley*, 797 F.3d at 177 (quotation marks omitted).

A plaintiff is also not required to plead facts that lie peculiarly within the opposing party's knowledge. *Ouaknine v. MacFarlane*, 897 F.2d 75, 81 (2d Cir. 1986). Thus, a plaintiff may plead scienter by alleging facts demonstrating that defendants "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000).

The District Court held that Klemperer and Collins lacked scienter with respect to their misrepresentations, but did not consider whether, separate and apart from those specific agents, the Pharma Defendants had scienter. (SPA-13-15.) As alleged and detailed below, the Pharma Defendants had both motive and opportunity to commit fraud and engaged in conscious misconduct. Their conduct could not have occurred without intent or recklessness. For the similar reasons, Klemperer and Collins had scienter. And, because they were acting with actual or apparent authority, their scienter is imputed to the Pharma Defendants. *See Am. Soc'y of Mech. Eng'rs v. Hydrolevel Corp.*, 456 U.S. 556, 568 (1982); *see also Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 615 F. App'x 44 (2d Cir. 2015).

### 1. The Pharma Defendants Had Motive and Opportunity

The most straightforward manner of alleging scienter is by motive and opportunity. Motive for scienter can "be shown by pointing to the concrete benefits that could be realized from one or more of the allegedly misleading statements or nondisclosures; opportunity could be shown by alleging the means used and the likely prospect of achieving concrete benefits by the means alleged." *Emps.' Ret. Sys.*, 794 F.3d at 309; *see also Novak*, 216 F.3d at 307. The "opportunity" element does not require allegations of an "elaborate plot," but rather allegations that a defendant is "well positioned to carry out the fraudulent transaction, such as when he possesses the necessary trust and authority." *Powers*, 57 F.3d at 185. In general, allegations of control over funds and motive to retain them for personal use are sufficient to allege scienter. *See, e.g.*, *Ouaknine*, 897 F.2d at 81.

### a. The Pharma Defendants Realized Concrete Benefits

The Pharma Defendants had motive to withhold material information from, and misrepresent material information to, Plaintiffs. As insiders transacting in shares of companies they had created, the Pharma Defendants stood to profit handsomely from their fraud. First, they were entitled to the value of all unvested Original Equity. (A-89; *see also* A-186, A-200-201, A-391-392, & A-406-407.) Thus, by requiring Plaintiffs to forfeit their Original Equity, they were directly and immediately enriched by Plaintiffs' relinquished share of the Rights. Second, the Pharma Defendants could use Plaintiffs' forfeited share of the Rights to attract

additional investors without diluting their own investment. Third, the fraud allowed the Pharma Defendants to have their cake and eat it too: they could reap the benefits of the low Swiss tax rate, exploit Plaintiffs' experience and expertise to increase the value of the Rights, and have no reciprocal obligation to pay Plaintiffs anything more than a discretionary payment in return.

The Pharma Defendants also had opportunity. They exercised exclusive control over the material information and had a position of power and authority to manipulate it. *See Powers*, 57 F.3d at 185. They orchestrated the Restructuring, created empty shell companies, drafted fraudulent contracts, then dispatched their agents to make false representations on their behalf. (A-93-108.) Indeed, Cerberus exclusively drafted the 2013 Award Agreements and required Plaintiffs to rely on the representations by Klemperer and Collins. (*E.g.*, A-433 at § 8.) The Pharma Defendants artfully manipulated the circumstances to facilitate their scheme.

### b. Klemperer Realized, and Collins Would Have Realized, Concrete Benefits

Regarding motive, Klemperer and Collins knew that Plaintiffs' labor increased the value the Rights, and knew that Plaintiffs' had been promised and expected millions for their investment. As a Cerberus executive, Klemperer had a personal financial interest in Cerberus's investment in Covis Holdings and the value of the Rights. (A-83 & A-126.) Collins similarly maintained a substantial share of interests in MIP LLC and Covis Holdings. (A-93-94 & A-126.) Because of their investment in Covis and their knowledge that the value of their investment in the

45

Rights was tied to Plaintiffs' continuing efforts, Klemperer and Collins had motive to mislead Plaintiffs to believe that the New Equity was not illusory so they would continue investing their labor. (A-126.)

As for opportunity, Collins and Klemperer had privileged access to material, non-public information because of their executive positions at numerous Covis Companies. (*See, e.g.*, A-83-85, 89-90, A-95, A-97, A-100, A-103-108). They knew, or should have known, the allocation of the Rights within Covis, and whether the New Companies—on whose behalf they spoke—owned any assets. (A-93-108.) And, it bears repeating, the 2013 Award Agreements *required* Plaintiffs to rely upon their statements. (*E.g.*, A-433 at § 8.)

Accordingly, Collins and Klemperer had motive and opportunity, and their scienter is imputed to the Pharma Defendants.

### c.     The District Court's Remarks Regarding Collins's Scienter Conflated Distinct Legal Concepts

When addressing Collins's motive and opportunity, the District Court remarked that his scienter was "unclear" because (a) he was not named as a defendant, (b) Plaintiffs "at one point described him in glowing terms," and (c) Collins was terminated prior to the cancelation of Plaintiffs' vested New Equity. (SPA-13.) District Court's remarks conflated several issues, but none of them relate to scienter.

*First*, the District Court conflated joinder with scienter. At oral argument, the District Court asked why Collins was not a defendant. Plaintiffs' counsel responded

46

that it would have been pointless: Cerberus was liable for his misconduct and Plaintiffs did not want to give Collins an incentive to proffer false testimony. (A-510.) The District Court replied, "You're saying he already had an incentive to lie. The reason I asked you that is because I'm trying to focus now on what you claim the scienter was." (*Id.*) But whether Collins was named as a defendant relates to joinder, not scienter. (*Id.*) And Collins is not a necessary party who must be joined. *See, e.g., Pujol v. Shearson Am. Exp., Inc.*, 877 F.2d 132, 136 (1st Cir. 1989) (Breyer, J.) ("that Party A, in a suit against Party B, intends to introduce evidence that will indicate that a non-party, C, behaved improperly does not, by itself, make C a necessary party"); *see also Milligan v. Anderson*, 522 F.2d 1202, 1203-05 (10th Cir. 1975). He was acting on behalf of the Pharma Defendants within the scope of his actual and apparent agency. The Pharma Defendants are at liberty to seek contribution from any jointly or severally liable non-party in a separate proceeding.

*Second*, the fact that Cerberus terminated Collins three months after he made the misrepresentations relates not to his scienter, but rather demonstrates that Cerberus controlled his conduct. (A-108.) It also shows that whatever personal incentive Collins might have had to intentionally or recklessly mislead Plaintiffs into signing the 2013 Award Agreements was thwarted when Cerberus fired him, making it highly unlikely that Collins was unjustly enriched.

*Finally*, whether Plaintiffs enjoyed working for Collins and trusted him relates to their mental states, *i.e.*, whether their reliance was justifiable. It is not relevant to Collins's mental state when he made the misrepresentations, *i.e.*, his scienter.

### 2. The Pharma Defendants' Misconduct was Conscious

The allegations also give rise to a strong inference that the Pharma Defendants intentionally withheld material information and knew that their contracts and representations were false when made.

To allege conscious misconduct, it is sufficient to allege that the defendants had "knowledge of facts or access to information contradicting their public statements." *Novak*, 216 F.3d at 308; *SEC v. Obus*, 693 F.3d 276, 286 (2d Cir. 2012). More generally, scienter is shown when a defendant makes an affirmative representation without any intent to perform. *See Wharf (Holdings) Ltd.*, 532 U.S. at 596; *see also Ouaknine*, 897 F.2d at 81; *see also Luce v. Edelstein*, 802 F.2d 49, 55-56 (2d Cir. 1986). The failure to perform promises under circumstances that are arbitrary, malicious, or completely unjustifiable creates a strong inference of scienter as well. *See Powers*, 57 F.3d at 185.

As detailed below, the most plausible explanation for the Pharma Defendants' misconduct is that it was conscious and willful: (1) they engaged in knowing misconduct; (2) they had a duty to disclose material information, they had sole possession of the material information, yet failed to do so, and (3) they acted in a deceptive and unjustifiable manner when canceling Plaintiffs' New Equity.

### a. The Pharma Defendants' Conduct Was Intentional

There is little question that the Pharma Defendants conduct was intentional. "Intentional misconduct is easily identified since it encompasses deliberate illegal

behavior, such as securities trading by insiders privy to undisclosed and material information." *Novak*, 216 F.3d at 308. As insiders, the Pharma Defendants had a duty to disclose all material information. They drafted the 2013 Award Agreements and § 83(b) forms, which said the New Equity entitled Plaintiffs to the appreciation of the New Companies and their assets. (A-431-487.) The Pharma Defendants' agents assured Plaintiffs that the value of their New Equity related to the appreciation of the Rights and would be grossed-up by 31%. (A-93-108.) Thus, they knew that Plaintiffs though the 2013 Award Agreements were legitimate contracts entailing concrete obligations from the Pharma Defendants. But, as the Pharma Defendants knew and intended, the New Companies had no real value and any distribution in connection with the New Equity would be subject entirely to their discretion. (A-119-121.) Given the significance of the misrepresentations and omissions, "[i]t is difficult to imagine how such events could have occurred if the defendants who controlled them had not actually intended to defraud." *Ouaknine*, 897 F.2d at 81; *see also Makor*, 513 F.3d at 710; *Luce*, 802 F.2d at 56.[17]

---

[17] Confirming that their misconduct was intentional, Defendants—a group that includes Klemperer—argued repeatedly before the District Court that they never intended to honor Klemperer's and Collins's representations. (*E.g.*, A-491-495; *see also* ECF No. 42 at 11-13; ECF No. 47 at 2-4.)

### b. The Pharma Defendants' Conduct was Reckless

Scienter encompasses recklessness. *Novak*, 216 F.3d at 307; Restatement (Second) of Torts ("Restatement") § 8A cmt. b (1979). Furthermore, a defendant is liable if it fosters a mistaken belief concerning a material fact knowing it will communicated to a third party. *See, e.g.*, Restatement § 533.

Here, the Pharma Defendants dispatched Klemperer and Collins to promote the New Equity to Plaintiffs on their behalf. (A-93-108; *see also* A-433 at § 8.) Under the circumstances, it is highly plausible that the Pharma Defendants recklessly fostered false beliefs in their agents knowing they would communicate them to, and mislead, Plaintiffs. Plaintiffs are entitled to discovery into the communications between the Pharma Defendants and their agents to confirm the veracity of this theory.

If Klemperer's and Collins's misstatements were not caused by the Pharma Defendants' recklessness, it is highly plausible that Klemperer and Collins themselves acted recklessly. As Judge Posner noted in *Makor*, it is highly implausible that corporate executives would make wildly inaccurate statements about a company without scienter. *See* 513 F.3d at 711. Indeed, courts within this Circuit routinely find scienter where the misrepresentations relate to a company's core operations. *See, e.g.*, *In re Salix Pharms., Ltd.*, No. 14 Civ. 8925 (KMW), 2016 U.S. Dist. LEXIS 54202, at *50 (S.D.N.Y. Apr. 22, 2016). Here, given Klemperer's and Collins's positions as executives with fiduciary obligations to Plaintiffs who were specifically tasked with making representations regarding the New Equity, and the

50

complete incongruity between their representations and the truth, it is plausible and cogent that their misstatements were reckless and/or intentional.

### c. The Pharma Defendants' Misconduct over 2014 and 2015 is Strong Circumstantial Evidence They Never Intended to Honor Their Promises

Finally, the character of a contractual breach—such as arbitrary or unjustifiable conduct—may constitute strong circumstantial evidence of an intent to deceive at the time of contract formation. *See Powers*, 57 F.3d at 185-86.

In *Ouaknine*, 897 F.2d 75, the defendants promised to pay investors out of the proceeds of a sale. The defendants controlled the entities in question, and, after they were sold, ample cash was available to make the promised payment. *See id.* at 79. But the defendants refused and paid substantially less than was due. The Second Circuit held that the allegations were sufficient to allege scienter because the non-performance occurred under circumstances so unjustifiable that they gave rise to a strong inference that the defendants never intended to perform. *See* 897 F.2d at 81-82; *see also Luce*, 802 F.2d at 55-56.

Here, the Pharma Defendants' misconduct over the course of 2014 and 2015 is further evidence that they had scienter when they duped Plaintiffs into accepting the illusory New Equity.

Defendants unjustifiably breached virtually every fiduciary and contractual obligation they still owed to Plaintiffs. After opportunistically forcing Plaintiffs to

forfeit most of their New Equity,[18] Defendants issued illusory Repurchase Agreements that falsely claimed compliance with the call procedures. (A-113-118 to A-403-404 at § 8.2(b) & A-415).) They unilaterally extended the closing period without excuse or explanation. (A-117-118.) They valued the New Equity in an arbitrary and deceptive manner that contravened their prior representations and promises and even contradicted the MIP US Operating Agreement. (A-119-122; *see also* A-391 at § 4.1(b)(vi)(A); A-390 at § 4.1(a)(iii)).)

In connection with the bad faith cancelation of Plaintiffs' vested New Equity, Defendants failed to disclose that Valeant had bid $800 million for the Rights in December 2014 (A-113.) They failed to disclose that Concordia offered $1.2 billion for Covis's entire portfolio in mid-January 2015 (A-118.) They failed to disclose that Cerberus negotiated to retaining the three products that had the most potential for additional appreciation. (A-122; *see also supra* p. 23 n.11.)

Finally, the Pharma Defendants realized more than $1 billion in profits. Everything about Covis was a success, except Plaintiffs' investment. As in *Ouaknine*, the Pharma Defendants simply decided to repudiate their prior promises and keep the proceeds for themselves. The only plausible explanation for their misconduct is

---

[18]    Defendants' bad faith conduct and nondisclosures related to the forfeiture of Plaintiffs' unvested New Equity and cancelation of their vested New Equity (*e.g.*, A-108-124) constitute additional violations § 10(b). *See Castellano*, 257 F.3d at 179; *see also Jordan*, 815 F.2d at 432-33, 437 (reasoning that § 10(b) prohibits opportunistic conduct); *Smith v. Duff & Phelps*, 891 F. 2d 1567, 1574 n.16 (11th Cir. 1990) (same).

that they never intended to abide by their promises in the first place. The only cogent conclusion is they acted with scienter. *See Ouaknine*, 897 F.2d at 81-82.

### D.     Plaintiffs Allege Harm

Finally, Plaintiffs have alleged that they were harmed to Defendants deceptive devices. Federal securities law entitles a defrauded investor to an array of damages recoveries, including benefit of the bargain and restitution. *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1049-50 (2d Cir. 1995) (benefit of the bargain); *Osofsky v. Zipf*, 645 F.2d 107, 114 (2d Cir. 1981) (same); *Affiliated Ute,* 406 U.S. at 154-55 (disgorgement).

Here, Plaintiffs allege in detail that they bargained for New Equity worth 2.87% of the Rights and a 31% gross-up. (A-124.) Thus, they reasonably expected to receive $9 million for their vested New Equity and should have received $37.5 million for all their New Equity, which the Pharma Defendants' systematically canceled in bad faith. (A-108-124; *see supra* p. 24.) Moreover, Defendants were unjustly enriched by duping Plaintiffs' to swap their Original Equity and share of the Rights for New Equity and realizing the benefit of Plaintiffs' continuing labor at below market salaries. (A-123-124.) Thus, Plaintiffs are entitled to the 1.25% of Covis Holdings that the Pharma Defendants recouped. Based upon Defendants' own theories, that would have equaled more than $16 million (1.25% × $1 billion × 131%). (*See* A-115-117 & A-123; *see also supra* p. 24.) The appropriate measure of Plaintiffs' is complex and fact sensitive and must be determined by the District Court after adjudication on the merits. *See, e.g.*, *Jordan*, 815 F.2d at 440-43.

### E.    The District Court Improperly Considered Documents Outside the Amended Complaint

When deciding a Rule 12(b)(6) motion, the court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Loreley*, 797 F.3d at 169. Generally, "consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Before materials outside the record may become the basis for dismissal, several conditions must be met, including whether all parties received the documents in question and whether they are subject to any factual disputes, such as authenticity. *See id.* If those conditions are not met, the motion must be converted to summary judgment and the parties must be given an opportunity to supplement the record. *Id.*

*Faulkner v. Beer* is directly on point. There, the District Court granted a motion to dismiss investors' § 10(b) claim. *See Faulkner v. Beer*, No. 03 Civ. 5284 (GBD), 2005 U.S. Dist. LEXIS 3074 (S.D.N.Y. Feb. 25, 2005), *vacated and remanded*, 463 F.3d 130. In support of their motion to dismiss, the defendants submitted documents outside the complaint, but the District Court did not analyze which investors had received which documents. The defendants offered additional documents at oral argument, and it was uncertain whether the District Court considered those in rendering its opinion. 463 F.3d at 135. The Second Circuit vacated the District Court's order, saying the defendants' improper submissions had caused "chaos." *Id.*

The proceedings here unfortunately mirror those in *Faulkner*. As in *Faulkner*, Defendants submitted the MIP LLC Operating Agreement, the Restructuring Agreement, and the MIP US Operating Agreement, which, per the Amended Complaint, had not been disclosed to Plaintiffs. (A-91 & A-94.) Defendants also submitted incomplete copies of their February 19 Letter and November 10 Letters, from which they removed the false valuations of the New Equity and the Rights. (A-489 & A-544-556; *see also* A-533 n.2.)

And, as in *Faulkner*, the District Court did not clarify whether it had taken the improper submissions into account. Rather, the District Court implied that it had done so. (SPA-8 n.15.) In fact, the District Court credited Defendants' hearsay for the truth of the matter asserted. For example, the District Court described the Summer 2014 Merger Negotiations as a "single 'fruitless' discussion" (SPA-16), using language that conformed to Defendants' characterization of the 2014 Merger Negotiations in its November 10 Letter (*see* A-551). The District Court similarly held Plaintiffs "could not establish" that the Summer 2014 Merger Negotiations were more extensive than a single discussion. (SPA-17.) But the Amended Complaint alleged the Summer 2014 Merger Negotiations took place over several months. (*See* A-109 & A-111.) Thus, the District Court assumed that Plaintiffs could not prove their allegations though there has been no discovery into the material Summer 2014 Merger Negotiations, which the Pharma Defendants have acknowledged, but not fully disclosed. (A-532-533.) Thus, it appears the District Court engaged in fact finding at the pleading stage.

If the District Court had converted Defendants' motion to one for summary judgment and given Plaintiffs the opportunity to supplement the record, Plaintiffs would have been able show that there are genuine issues of material fact. As discussed herein, Plaintiffs would have noted that the November 10 Letter is a party admission that the 2013 Award Agreements and Defendants' inducements to persuade Plaintiffs to swap their Original Equity for illusory New Equity were knowingly false. (*See* A-548-550.) They would have submitted the Repurchase Agreements and valuation materials that Defendants removed from their February 19 and November 10 Letters, which evidence that the Valuations and the Pharma Defendants' representations about the value of the New Equity and Rights were false and arbitrary. If the District Court had converted Defendants' motion, it would have been denied.

For these reasons alone, the Opinion should be reversed.

## F.    Plaintiffs' Remaining Claims Were Adequately Alleged

Because the District Court dismissed Plaintiffs' § 10(b) claim, it dismissed their § 20(a) claim, and declined to exercise supplemental jurisdiction over their state law claims. (SPA-17-18.) If the Court reverses, Plaintiffs' other claims should be reinstated.

## II.   THE DISTRICT COURT ABUSED ITS DISCRETION BY DENYING LEAVE TO AMEND

Finally, Plaintiffs requested leave to amend in the event the District Court dismissed any part of the Amended Complaint. (ECF No. 46 at 25 ("If the Court

dismisses any part of the Amended Complaint, Plaintiffs request leave to file a Second Amended Complaint to cure any deficiencies." (citing *Loreley*, 797 F.3d at 191)).) The District Court rejected the request *sub silentio*, dismissing the Amended Complaint with prejudice. (SPA-18.) The District Court abused its discretion.

Rule 15 states that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2). Though leave to amend falls within the trial court's discretion, "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Courts cannot avoid decisions on the merits by resort to technicalities. *Id.*

The liberality of Rule 15 is critical when a plaintiff alleges securities fraud, which are subject to Rule 9(b) and the PSLRA. "[W]e are not operating in the world of notice pleadings [and] in this technical and demanding corner of the law, the drafting of a cognizable complaint can be a matter of trial and error." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). Because of the heightened pleading standards, "pleading defects may not only be latent, and easily missed or misperceived without full briefing and judicial resolution." *Loreley*, 797 F.3d at 191. This is particularly the case regarding allegations of materiality and scienter, which "entail judgment calls on which reasonable minds can differ in a not insignificant number of cases." *Id.*

Accordingly, "[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend." *Luce*, 802 F.2d at 56. When "plaintiffs specifically request leave to amend in the event that the court is inclined to dismiss on Rule 9(b) grounds, the failure to grant leave to amend is an abuse of discretion unless the plaintiff has acted in bad faith or the amendment would be futile." *Caputo v. Pfizer, Inc.*, 267 F.3d 181, 191 (2d Cir. 2001).

Here, the District Court made no findings regarding Plaintiffs' request for leave to amend, and there is nothing in the record to suggest either bad faith or futility. *First,* Plaintiffs requested leave to amend in good faith to address to address any deficiencies identified by the District Court. Because this case stands in the pre-answer, pre-discovery phase, Defendants will not be prejudiced. *Second*, the District Court dismissed Plaintiffs' § 10(b) claim not because of any fatal deficiency, but rather because it said Plaintiffs' theory of scienter was unclear, and certain allegations were conclusory. (*See* SPA-12-17.) Any lack of clarity or detail identified by the District Court or this Court can and will be ameliorated on remand.

## CONCLUSION

The Judgment should be reversed, the Opinion granting Defendants' motion to dismiss should be vacated, and this matter should be remanded with instructions to order Defendants to answer the Amended Complaint. In the alternative, the denial of leave to amend should be vacated, and this matter should be remanded with instructions to allow Plaintiffs to amend.

Dated:  New York, New York
        February 22, 2017

By: ___/s/ Joshua L. Seifert_____
Joshua L. Seifert, Esq.
Joshua L. Seifert PLLC
40 Worth Street, 10th Floor
New York, NY 10013
(646) 527-7366
jseifert@seifertpllc.com

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

A.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,048 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

B.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word in 14-point Adobe Garamond Pro font.

Dated:        New York, New York
              February 22, 2017

                                        By:  __/s/ Joshua L. Seifert____
                                        Joshua L. Seifert, Esq.
                                        Joshua L. Seifert PLLC
                                        40 Worth Street, 10th Floor
                                        New York, NY 10013
                                        (646) 527-7366
                                        jseifert@seifertpllc.com

                                        *Attorney for Plaintiffs-Appellants*

# Special Appendix

**i**

## TABLE OF CONTENTS

**Page**

Memorandum Decision and Order of the Hon.
  George B. Daniels, dated December 12, 2016....... SPA-1

Judgment, dated December 13, 2016........................ SPA-19

15 U.S.C.S. § 78j ...................................................... SPA-21

17 C.F.R. § 240.10b-15.............................................. SPA-23

15 U.S.C.S. § 78u-4 .................................................. SPA-24

SPA-1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: DEC 12 2016

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TONYA BROWN, JOHN ELSTAD, ALBERT :
GOEKEN, ELIZABETH HOMAN, and JEFFREY :
SAMPERE, :
                   :
               Plaintiffs, :
     -against- :
                   :
CERBERUS CAPITAL MANAGEMENT, L.P., :
CERBERUS COVIS LLC, COVIS HOLDINGS, :
L.P., COVIS MANGEMENT INVESTORS LLC, :
COVIS US HOLDINGS, LLC, COVIS :
MANGEMENT INVESTORS US LLC, COVIS :
PHARMACEUTICALS, INC., PRINCETON :
BIOPHARMA CAPITAL PARTNERS, LLC, :
PRINCETON BIOPHARMA COINVESTMENT :
I, L.P., ALEXANDER BENJAMIN, MICHAEL :
KELLY, ETHAN KLEMPERER, and MICHAEL :
WELLS, :
                   :
               Defendants. :
                   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

<u>MEMORANDUM DECISION</u>
<u>AND ORDER</u>

15 Civ. 9022 (GBD)

GEORGE B. DANIELS, United States District Judge:

       Plaintiffs Tonya Brown, John Elstad, Albert Goeken, Elizabeth Homan, and Jeffrey

Sampere bring this action against Defendants Covis Holdings, L.P., Covis US Holdings, LLC,

Covis Management Investors LLC, Covis Management Investors US LLC, and Covis

Pharmaceuticals, Inc. (together, "Covis"); Cerberus Capital Management, L.P. and Cerberus Covis

LLC (together, "Cerberus"); Princeton BioPharma Capital Partners, LLC and Princeton

BioPharma Coinvestment I, L.P. (together, "Princeton"); and individual Defendants Alexander

Benjamin, Michael Kelly, Ethan Klemperer, and Michael Wells. (Am. Compl., ECF No. 26, at 1.)

Plaintiffs bring claims against all Defendants under Section 10(b) of the Securities Exchange Act

of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5. (*Id.* ¶¶ 332-60.) Plaintiffs

also assert a claim for control person liability under Section 20 of the Exchange Act, 15 U.S.C.

78t(a), against Cerberus, Covis, Princeton, Benjamin, Klemperer, and Wells.  (*Id.* ¶¶ 361-66.)

Plaintiffs also bring claims under the North Carolina Securities Act, New Jersey Uniform

Securities Law, and Minnesota Uniform Securities Act for the same conduct underlying the federal

securities claims.  (*Id.* ¶¶ 367-468.)  Plaintiffs do not specify the state law under which they bring

their claims for common law fraud, civil conspiracy, negligent misrepresentation, breach of

contract, breach of the covenant of good faith and fair dealing, tortious interference with contract,

unjust enrichment, promissory estoppel, or equitable estoppel.  (*Id.* ¶¶ 469-611.)

Defendants moved to dismiss the Amended Complaint pursuant to Rules 9(b) and 12(b)(6)

of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995,

15 U.S.C. § 78u-4.  (Mot. Dismiss, ECF No. 41; Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem."),

ECF No. 42.)[1]

Defendants' motion to dismiss is GRANTED as to Plaintiffs' federal claims under the

Securities Exchange Act.  This Court declines to exercise supplemental jurisdiction over Plaintiffs'

remaining state law and common law claims.

## I.      BACKGROUND

Defendant Covis was a pharmaceuticals start-up founded by William Collins and Ronald

Lickteig.  (Am. Compl. ¶¶ 53-54.)  Their objective was to obtain distribution rights to branded

drugs that had gone off-patent and turn them into acquisition targets for healthcare companies.  (*Id.*

¶ 54.)  Defendants Cerberus and Princeton provided financing for the founding.  (*Id.* ¶¶ 55, 92.)

Plaintiffs are former managers of Covis Pharmaceuticals, Inc. ("CPI"), a North Carolina

corporation and Covis subsidiary that distributed Covis's products in the United States.  (*Id.* ¶¶ 3,

---

[1] Plaintiffs filed their original Complaint on November 17, 2015, and Defendants moved to dismiss that
Complaint on January 25, 2016.  In response, on February 16, 2016, Plaintiffs filed a First Amended
Complaint, which prompted the Motion to Dismiss at issue here.

38.)  At their hiring between September 2011 and February 2012, Plaintiffs constituted five of the eight members of CPI management.  (*Id.* ¶¶ 3, 29-33.)  As part of their compensation packages, Defendant Covis promised Plaintiffs "profits interests," i.e. equity interests in the future profits and appreciation of the assets of Covis.  (*Id.* ¶ 5.)

In September 2012, Defendant Covis issued an initial set of award agreements ("2012 Award Agreements") granting Plaintiffs a total of 1.25% of the fully diluted equity of Covis Holdings, L.P.  (*Id.* ¶¶ 100-11.)  In October 2013, following a restructuring, Covis issued new agreements ("2013 Award Agreements") through which Plaintiffs relinquished their 2012 profits interests and obtained profits interests in a new entity, Covis Management Investors US LLC ("MIP US").  (*Id.* ¶¶ 129, 136.)[2]  As with the 2012 Award Agreements, half of the profits interests were performance-based and the other half were time-based that vested over the next four years. If a grantee were still employed during a "Winding Up Event," including the sale or acquisition of substantially all of Covis's assets, all time-based interests would immediately vest.  (*Id.* ¶¶ 149-53.)  On the other hand, if any employee were terminated without cause, MIP US had the option of repurchasing his vested profits interests (the "Call Right").  (*Id.* ¶¶ 20, 161-62.)[3]

---

[2] Plaintiffs were five of the eight members of MIP US, and Defendants Benjamin and Klemperer (of Cerberus) and Defendant Wells (of Princeton) made up the MIP US Board of Managers.  (Am. Compl. ¶¶ 144, 147.)  MIP US owned interests in Covis US Holdings, LLC ("Covis US Holdings"), a holding company that owned CPI.  (*Id.* at ¶ 129.)  Cerberus owned Covis US Holdings.  (*Id.* ¶¶ 9-10.)

[3] According to the 2013 Award Agreement, the purchase price for shares repurchased through the Call Right was "the Fair Market Value of such interests as of the Termination Date as determined in accordance with the [MIP US Operating Agreement]."  (*Id.* ¶ 162.)  Further, the Preamble to the 2013 Award Agreement states that it is "subject in its entirety to the terms and provisions" of the MIP US Operating Agreement ("Operating Agreement"). (Defs.' Decl. Supp. Mot. Dismiss ("Decl."), ECF No. 43, Ex. J.)  In turn, Section 8.2 of the Operating Agreement states that "[u]nless otherwise provided by the terms of an applicable Award Agreement, or Other Agreement," MIP US was entitled to repurchase vested profits interests of an employee terminated without cause at the fair market value as "determined in good faith by the Board of Managers."  (Decl., Ex. H, at 23, A-2, A-3.)

In the Amended Complaint, Plaintiffs allege two general theories of fraud.  First, Plaintiffs allege that they were fraudulently induced into executing the 2013 Award Agreements through false representations by two Covis representatives.  However, the statements upon which Plaintiffs purportedly relied were not reflected in the contracts they signed or written disclosure schedules that Covis provided.  The majority of those statements were oral representations by former CPI CEO William Collins, who is not named as a Defendant in this action.  Second, Plaintiffs allege that the Defendants generally engaged in a fraudulent "scheme" to terminate Plaintiffs and thereby retain a greater share of Covis profits for Defendants.

As to the first theory, Plaintiffs cite several misstatements by Defendant Klemperer and former CEO Collins that were purportedly intended to induce Plaintiffs into executing the 2013 Award Agreements.  During an October 7, 2013 web-based presentation,[4] Plaintiffs allege that Defendant Klemperer misrepresented that distributions to MIP US Profits Interests holders would be "grossed-up" by 31%.[5]  (*Id.* ¶ 192.)  At the conclusion of the presentation, Plaintiffs also allege that Collins told Plaintiff Brown that 3.5% of the appreciation in value of Covis had been allocated to CPI management.  (*Id.* ¶ 200.)

Together with the presentation, Covis also issued written personalized equity schedules ("CPI Equity Schedules") to each of the Plaintiffs.  (*Id.* ¶ 201.)  These documents did not contain any representations regarding a 31% gross-up or confirm Collins's assertion that 3.5% of Covis's profits were allocated to CPI management.  Rather, the schedules indicated that Plaintiffs held a

---

[4] Brown, Goeken, and Sampere viewed the presentation from a conference room at CPI's headquarters. Homan participated online from home.  Elstad did not participate.  (Am. Compl. ¶ 179.)

[5] Plaintiffs also allege that Defendant Klemperer asserted that the Restructuring Supply Agreement confirmed that Plaintiffs' profits interests related to the value of the entire Covis enterprise, and that Covis was required to memorialize these representations and commitments in an amendment to the Supply Agreement.  (*Id.* ¶¶ 188-89, 193.)

"Total Covis Holdings Interest Post Sanofi Dilution" of 0.86%[6]—approximately 30% less than the 1.25% of Covis Holdings, L.P. that Plaintiffs received in the 2012 Award Agreements.   (*Id.* ¶ 111.)  A footnote on the schedules explained that "Class A shareholders invested $40mm of new capital to consummate the Sanofi transaction on April 4, 2013 resulting in 30% dilution to Class B shareholders."  (*Id.*)  The schedules also indicated that Plaintiffs' share of "CPI Mgmt Interests" remained unchanged in the new award agreements.[7]

Over the next few days, Collins continued to disseminate information about the new award agreements that was not reflected in the printed CPI Equity Schedules.  Collins purportedly told Plaintiff Sampere that the restructuring allocated 3.5% of Covis's profits to CPI management. Collins wrote out an example equation on Sampere's CPI Equity Schedule indicating that if Covis was sold for a $300 million profit, Sampere's 16.4% "CPI Mgmt Interests" would total $1,722,000 (or 16.4% of 3.5% of $300 million).  (*Id.* ¶¶ 208-12, Ex. A.)  Collins also stated that Covis would gross-up any distribution by 31%.  (*Id.* ¶ 213.)  Later, Collins made similar representations to Plaintiffs Goeken and Homan.  (*Id.* ¶¶ 214-220.)[8]

In sum, the Amended Complaint's first theory of fraud is based on the "extra-contractual" statements of two individuals: Defendant Klemperer, who stated that distributions to MIP US profits interests holders would be grossed-up by 31% (which Collins repeated), and that Klemperer's representations would be memorialized in an amendment to the Supply Agreement; and Collins, who stated that the five Plaintiffs were entitled to 82% of the 3.5% appreciation in value of Covis and its assets.  (*Id.* ¶ 13.)  Critically, Plaintiffs concede that these representations

---

[6] Brown received 0.07%, Elstad, Homan, and Sampere each received 0.17%, and Goeken received 0.28%. (Decl., Ex. I.)

[7] Brown received 6.6%, Elstad, Homan, and Sampere each received 16.4%, and Goeken received 26.3%. (Am. Compl. ¶ 202.)  The Equity Schedules did not define "CPI Mgmt Interests."

[8] Goeken informed Elstad about his conversation with Collins.  (*Id.* ¶ 222.)

were not contained in the 2013 Award Agreements or any other restructuring-related document. (*Id.* ¶ 225.)

As to the second theory of fraud, Plaintiffs allege that Defendants "plotted schemes of bad faith, deceit, and manipulation to retain the profits for themselves and deprive Plaintiffs of nearly everything they had earned." (*Id.* ¶ 16.) First, Plaintiffs allege that Defendants "established impossibly high performance targets that deprived Plaintiffs of all of their unvested performance-based Profits Interests." (*Id.* ¶ 17.) Second, when Defendant Covis anticipated an acquisition, it terminated Plaintiffs in bad faith "as a pretext to cancel their unvested time-based Profits interests and deprive them of their *pro rata* share of Covis's value." (*Id.* ¶ 18.)

In December 2013, Collins was replaced as CPI's CEO by Defendant Kelly. (*Id.* ¶ 227.) Thereafter, the Amended Complaint asserts that Covis, purportedly at the direction of Defendant Kelly, launched a "bad faith strategy to oust Plaintiffs." (*Id.* ¶¶ 229-30.) Over the next year, each of the five Plaintiffs was terminated or resigned from CPI. In June 2014, Covis informed Brown, Elstad, and Goeken that their positions were being eliminated due to operational inefficiencies uncovered by an audit.[9] (*Id.* ¶¶ 29, 236-37.) The Plaintiffs were told that their terminations were due to reorganization and not based on performance, and were encouraged to reapply to the company. (*Id.* ¶ 238.) Although Covis offered Goeken a part-time role at a reduced salary, Goeken informed Defendant Kelly that he decided to resign because no Winding Up Event was on the horizon. (*Id.* ¶¶ 248, 250.)[10] In November 2014, Covis terminated its cardiovascular sales team, including Plaintiffs Homan and Sampere. (*Id.* ¶ 256.)

---

[9] Brown and Elstad were terminated effective June 24 and June 30, 2014, respectively. (*Id.* ¶¶ 245-46.)

[10] Goeken resigned on August 14, 2014. (*Id.* ¶ 31.)

Around this same period, Covis received interest from several potential acquirers. The Amended Complaint asserts that Defendants Cerberus and Covis discussed merging with a pharmaceutical company in summer 2014, close in time to Goeken's resignation.[11] (*Id.* ¶ 251.) In mid-December 2014, Valeant Pharmaceuticals made an unsuccessful $800 million bid for Covis's portfolio. (*Id.* ¶ 266.)

On December 31, 2014, Covis issued repurchase agreements to all five Plaintiffs.[12] (*Id.* ¶ 267.) To calculate the repurchase price, the MIP US Board of Managers (i.e., Defendants Benjamin, Klemperer, and Wells) assigned a fair market value of $1.26 for each of the MIP US Profits Interests. (*Id.* ¶ 277.) Defendant Kelly later explained to Plaintiffs Homan and Goeken that the Board of Managers calculated the interests based on a June 2014 Cerberus valuation, which concluded that Covis was worth approximately $478 million with $180 million in profits. (*Id.* ¶ 282.)[13]

On January 25, 2015, Concordia Healthcare, Inc. ("Concordia") issued an indication of interest to Covis. (*Id.* ¶ 295.) On February 12, 2015, the companies executed a letter of intent. (*Id.* ¶ 297.)

Plaintiffs claim that over the next few weeks, the MIP US Board of Managers (Benjamin, Klemperer, and Wells) "maliciously canceled Plaintiffs' interests using fraudulent valuations" and "knowingly misrepresented" the value of the Covis enterprise. (Pls.' Mem. Opp. Mot. Dismiss ("Opp. Mem."), at 19; Am. Compl. ¶ 355.) On February 19, 2015, Covis issued notice letters to

---

[11] Plaintiffs claim Defendant Kelly's failure to inform Goeken of this discussion was a fraudulent omission. (*Id.* ¶¶ 344-47.)

[12] The repurchase agreements followed Homan's and Sampere's terminations, which were effective December 1 and December 15, respectively. (*Id.* ¶¶ 32-33.)

[13] The Board of Managers applied a 15% marketability discount to reach the $1.26 per unit price. (*Id.* at 282.)

Plaintiffs exercising the Call Right on Plaintiffs' MIP US Profits Interests.  (Am. Compl. ¶ 299.)

The call notices attached valuations that were determined by the MIP US Board of Managers and

purportedly based on the fair market value of the profits interests as of Plaintiffs' termination date.

(*Id.* ¶¶ 277, 299.)  However, Plaintiffs claim Defendants calculated their shares in bad faith by

"ignor[ing] the bids that Covis had received over the course of 2014, which far exceeded $478

million," and by ignoring the earlier representations by Collins and Defendant Klemperer.  (*Id.* ¶¶

285-90.)

On February 26, 2015, MIP US cancelled Plaintiffs' MIP US Profits Interests and issued

payments equal to $1.26 per unit.  (*Id.* ¶ 316.)  Plaintiffs were paid a total of $290,000.  (*Id.* ¶¶ 25,

330.)  On March 9, 2015, Covis announced that it had sold the majority of its pharmaceuticals

products portfolio to Concordia for $1.2 billion.  (*Id.* at 2, ¶ 317.)

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss Under Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plaintiff

must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a

facially plausible claim requires pleading facts that enable the court "to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  Thus,

the factual allegations pleaded "must be enough to raise a right to relief above the speculative

level."  *Twombly*, 550 U.S. at 555.[14]

---

[14] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the
complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken,
or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether Plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 CIV. 6909, 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court also draws all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119-20 (2d Cir. 2013).

## B.    Liability Under Section 10(b) and Rule 10b-5

Stating a claim under Section 10(b) of the Exchange Act and Rule 10b-5(b) requires a showing of: "(i) a material misrepresentation or omission; (ii) scienter; (iii) 'a connection with the purchase or sale of a security[;]' (iv) reliance by the plaintiff(s); (v) economic loss; and (vi) loss causation." *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 158 (2d Cir. 2012) (alteration in original) (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)). Thus, Plaintiff must allege facts that support the plausible inference that Defendants acted with the "intention 'to deceive, manipulate, or defraud.'" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 & n.12 (1976)).

In addition, a securities fraud complaint must meet the heightened pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Rule 9(b) requires that the "circumstances constituting fraud" must be "state[d] with particularity." Fed. R.

bringing suit.'" *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

SPA-10

Civ. P. 9(b).   "Allegations that are conclusory or unsupported by factual assertions are insufficient." *ATSI Commc'ns, Inc.*, 493 F.3d at 99.  The requisite "strong" inference "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314.  "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id.* at 323.

The Second Circuit has held that a failure to carry out a promise only constitutes fraud if "the defendant secretly intended not to perform or knew he could not perform." *Mills v. Polar Molecular Corp*, 12 F.3d 1170, 1176 (2d Cir. 1993).  Further, the breach of contract must demonstrate "strong circumstantial evidence of an intent to deceive," or the complaint must allege "particularized facts supporting a cogent and compelling inference" of fraudulent intent.  *Capital Mgmt. Select Fund Ltd.*, 680 F.3d 214, 226 (2d Cir. 2012) (internal citations omitted).  *See also Dujardin v. Liberty Media Corp.*, 359 F. Supp. 2d 337, 352 (S.D.N.Y. 2005).

Under Rule 10b-5(a) and (c), it is unlawful "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  *See* 17 C.F.R. § 240.10b-5.  A plaintiff states a claim that the defendant has engaged in a deceptive or fraudulent scheme in violation of Rule 10b-5(a) and (c) by alleging that the defendant: "(1) committed a deceptive or manipulative act, (2) with the requisite scienter, (3) that the act affected the market for securities or was otherwise in connection with their purchase or sale, and that (4) defendant's actions caused the plaintiff's injuries." *IBEW Local 90 Pension Fund v. Deutsche Bank AG*, No. 11 Civ. 4209, 2013 WL 1223844, at *11 (S.D.N.Y. Mar. 27, 2013).

"The PSLRA's pleading requirements regarding misleading statements and omissions do not apply to claims that . . . are based on alleged violations of Rule 10b-5(a) and (c)." *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 492 (S.D.N.Y. 2005); *accord In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474-75 (S.D.N.Y. 2005).  However, subsection b(2) of the PSLRA, which requires that a plaintiff allege scienter with particularity, is applicable to a claim of scheme liability under Rule 10b-5(a) and (c).  15 U.S.C. § 78u-4(b)(2)(A); *In re Alstom*, 406 F. Supp. 2d at 475; *see also Waterford Twp. Police & Fire Ret. Sys. v. Smithtown Bancorp., Inc.*, No. 10-CV-864, 2014 WL 3569338, at *7 (E.D.N.Y. July 18, 2014).

### C.    Control Person Liability Under Section 20(a)

Section 20(a) of the Exchange Act imposes liability on "[e]very person who, directly or indirectly, controls any person" directly liable under the Exchange Act.  15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns*, 493 F.3d at 108.

### III.    PLAINTIFFS' ALLEGATIONS FAIL TO STATE A CLAIM UNDER THE FEDERAL SECURITIES LAWS

### A.    Liability Under Section 10(b)

Plaintiffs argue that Defendants violated Section 10(b) in two ways.  First, they argue that Defendants violated Rule 10b-5(b) through Collins's and Defendant Klemperer's misrepresentations regarding Plaintiffs' 2013 Award Agreements.  (*Id.* ¶ 342.)  Second, they argue that Defendants violated Rule 10b-5(a) and (c) through a fraudulent scheme of deceptive conduct.  Plaintiffs have failed to adequately plead scienter under either theory.

SPA-12

Although the Amended Complaint asserts claims against 12 different Defendants, the majority of the allegations focus on five purported individual bad actors, one of whom (Collins) is not named as a Defendant in this action. Collins—who was ousted from the company in December 2013, shortly after making the statements at issue—is alleged to have misrepresented the percentage of Covis's assets that was allocated to Plaintiffs and misrepresented that Plaintiffs' distributions would be grossed-up. Defendant Klemperer is also alleged to have misrepresented the gross-up of Plaintiffs' distributions, and stated further that Covis would memorialize this and other commitments in an amendment to the Supply Agreement.[15] Defendants Benjamin, Klemperer, and Wells, who constituted the MIP US Board of Managers, are together alleged to have acted in bad faith in valuing Plaintiffs' profits interests.[16] Finally, Defendant Kelly is alleged to have withheld material information from Plaintiff Goeken in connection with his resignation, and to have participated with the other named Defendants in a scheme to terminate Plaintiffs in bad faith and hoard profits owed to Plaintiffs.[17] Plaintiffs have not sufficiently alleged scienter as to any named Defendant.

### a. Rule 10b-5(b)

Plaintiffs' fraud claim under Rule 10b-5(b) is premised on the representations of two individuals, Collins and Defendant Klemperer. (*See* Opp. Mem., at 11-13.) The most important representation on which Plaintiffs rely is Collins's statement that 3.5% of the appreciation in value

---

[15] Plaintiffs claim that because Collins and Defendant Klemperer made representations "within the scope of their agency," Defendants Covis and Cerberus are liable for their representations. (Opp. Mem., at 13.)

[16] Defendant Klemperer is also cited for his role on the Covis US Holdings Board of Managers, which set Plaintiffs' performance targets. (Am. Compl. ¶¶ 155-57.)

[17] Plaintiffs allege that "[e]ach deceptive and manipulative act was in service of Cerberus and Princeton, who directly profited by their agents' misconduct." (Opp. Mem., at 19.) Plaintiffs further allege that Defendants Cerberus and Princeton "controlled" Defendants Klemperer, Benjamin, and Wells, who in turn controlled the MIP US Board of Managers, and that "Covis and Cerberus controlled Mr. Collins and Mr. Klemperer." (Am. Compl., at 20.)

of Covis had been allocated to CPI management.  Indeed, in this action, Plaintiffs claim they are owed 2.9% of Covis's profits from the Concordia sale (representing their share of the 3.5% that was purportedly allocated to CPI management), or approximately $30 million.  (Am. Compl. ¶ 2; June 14, 2016 Oral Arg. Tr. ("Oral Arg. Tr."), ECF 53, at 69:13-18.)  However, Collins is not a Defendant in this case, and Plaintiffs' theory of scienter as to Collins remains unclear.  At oral arguments, Plaintiff's counsel explained that Collins was not named as a Defendant because "[w]e don't want to give him an incentive to lie, effectively."  (Oral Arg. Tr., at 80:9-15.)  Notably, in contrast with the accusations elsewhere in the Amended Complaint, Collins is at one point described in glowing terms.[18]  Nonetheless, Plaintiffs claim in conclusory fashion that Collins acted with scienter and that his scienter is imputed to other corporate Defendants.  At the same time, Plaintiffs acknowledge that Collins was no longer at the company at the time of Defendant Covis's purported breach—in fact, he was ousted by Defendant Cerberus a full year earlier.  (Am. Compl. ¶ 227.)

To be sure, Plaintiffs also argue that the Amended Complaint states a claim for a Rule 10b-5(b) violation based on Defendant Klemperer's misrepresentation that Plaintiffs' distributions would be grossed-up by 31%, which would be memorialized in an amendment to the Supply Agreement.  But it is not clear how material this information was to Plaintiffs' decision to sign the 2013 Award Agreements.  Their theory of the case appears to be that they are owed $30 million based on the 2.9% share of profits that Collins (not Defendant Klemperer) purportedly promised them.  (See Am. Compl. ¶ 2; Oral Arg. Tr., at 79:13-21) (explaining that Plaintiffs calculated their damages based on the profits Collins said they would receive).

---

[18] The Amended Complaint states: "Mr. Collins had been a demanding leader, but he had created a collegial atmosphere.  Plaintiffs worked around the clock for him.  There was a great sense of camaraderie as everyone worked toward a mutually beneficial goal."  (Id. ¶ 228.)

Separately, Plaintiffs also allege reliance on the CPI Equity Schedules themselves, claiming that those documents were made on behalf of and for the benefit of the corporate Defendants to induce Plaintiffs into executing the 2013 Award Agreements. (Am. Compl. ¶¶ 223-24.) But the CPI Equity Schedules, as printed, did not confirm the 31% gross-up or represent that Plaintiffs would share 3.5% of the Covis profits. (Decl., Ex. I.) Instead, the printed schedules indicate that Plaintiffs' "CPI Mgmt Interests" holdings would not change in the restructuring, while their Covis holdings were diluted by 30%. Nonetheless, on Plaintiff Sampere's CPI Equity Schedule only, Collins wrote out "35% Tax Grossed Up" and an equation indicating that Sampere would share in 3.5% of the profits from a Covis sale. (Am. Compl., at 96.) Although Plaintiffs concede that Collins's representations did not appear in any other restructuring-related document or the 2013 Award Agreement, they argue that the statements were "extra-contractual" promises on which Plaintiffs reasonably relied. (*See, e.g.*, Oral Arg. Tr., at 94:7-8.)

Plaintiffs's theory of fraud is fatally deficient for its failure to adequately plead scienter. Under the PSLRA, Plaintiffs must state with particularity facts "(1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. But Plaintiffs cite no factual support for the allegation, on information and belief, that Defendants "knowingly and intentionally agreed and conspired among themselves to harm Plaintiffs and to commit the actions alleged herein." (Am. Compl. ¶ 52.) Nor do they provide any basis for the allegation that Defendants "never had any intention of abiding by these representations." (*Id.* ¶ 340.) As a result, Plaintiffs have not provided "strong circumstantial evidence of an intent to deceive at the time of contract formation" or "particularized facts supporting a cogent and compelling inference of that intent." *Capital Mgmt. Select Fund*, 680 F.3d at 226 (internal

citations and quotation marks omitted). Such "a conclusory allegation of intent to breach at the time of execution will not do." *Id.*; *see also Gurary v. Winehouse*, 235 F.3d 792, 801 (2d Cir. 2000).

Plaintiffs also rely on the theory that Collins and Defendants Covis and Klemperer and had "motive and opportunity" to fraudulently induce Plaintiffs into executing the 2013 Award Agreements and thereby "continue increasing the value of the Covis Enterprise" to their financial benefit. (Am. Compl. ¶ 341.) However, a complaint fails to plead scienter under a theory of motive and opportunity if it does not allege that defendants possess unique motives not shared by virtually all corporate insiders, such as the desire to sustain "the appearance of corporate profitability" or the "success of an investment." *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quoting *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996)). Instead, Plaintiffs must allege that "defendants benefitted in some concrete and personal way from the purported fraud." *Id.* at 307-08. The unsupported allegation that Defendants acted "to retain the profits for themselves" does not meet this standard. (Am. Compl. ¶ 16.) As such, Plaintiffs have not sufficiently alleged scienter under the PSLRA as to any named Defendant.

   b.  *Rule 10b-5(a) and (c)*

Plaintiffs' argument for primary liability under Rule 10b-5(a) or (c) also fails because of the failure to adequately plead scienter. Plaintiffs offer no support for the allegations that Covis "set impossible and unreasonable Performance Targets" or that Covis and Cerberus representatives "systematically terminated Plaintiffs in bad faith" and "engineered the bad faith terminations" for the purpose of increasing profits. (*Id.* ¶¶ 350-54.) Rather, the Amended Complaint merely alleges in a conclusory fashion that Defendants "plotted schemes of bad faith, deceit, and manipulation to retain the profits for themselves" and terminated Plaintiffs "as a pretext to cancel their unvested

time-based Profits interests and deprive them of their *pro rata* share of Covis's value." (*Id.* ¶¶ 16, 18.) Further, it asserts that CPI (including Defendant Kelly) and the MIP US Board of Managers (i.e., Defendants Benjamin, Klemperer, and Wells) had motive and opportunity regarding these acts "because their bad faith conduct increased the profits distributable" to Covis, Cerberus, Princeton, and other holders. (*Id.* ¶¶ 355-58.) But the Amended Complaint does not show with particularity how Defendants "benefitted in some concrete and personal way" from the purported fraud. *Novak*, 216 F.3d at 307. The bare allegation of "motive and opportunity" to increase profits is not sufficient.

Similarly, Plaintiffs make the conclusory assertion that the MIP US Board of Managers "maliciously canceled" Plaintiffs' interests using fraudulent valuations and "knowingly misrepresented" that Covis was worth $478 million as determined by the June 2014 Cerberus study. But Plaintiffs have not submitted facts giving rise to a "strong" inference of scienter. As exhibited by the oral arguments on Defendants' motion, there are varying issues of contractual interpretation underlying Covis's valuation of the MIP US Profits Interests. Regardless of whether Plaintiffs' allegations might support a state law breach of contract claim, the Amended Complaint does not establish cogent and compelling evidence of an intention to defraud. *Tellabs*, 551 U.S. at 324.

The Amended Complaint also alleges that Defendant Kelly, as well as the MIP US Board of Managers (consisting of Defendants Benjamin, Klemperer, and Wells) withheld material information from Plaintiff Goeken prior to his resignation. As factual support, Plaintiffs quoted from a letter from Defendants' counsel that referred to "a discussion during the early summer of 2014 with a potential merger counterpart, which was also fruitless." (Oral Arg. Tr., at 54.) Plaintiffs conceded that those merger discussions fell apart prior to Goeken's termination, but

argue that the information was nonetheless material under *Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171 (2d Cir. 2001). In that case, during the period of time that plaintiff and his employer were actively negotiating the terms of his resignation, the employer had hired an investment bank to staff a possible merger, and the CEOs and CFOs of both companies had met to discuss possible structures for the transaction and operational issues. *Id.* at 180. The Second Circuit held that such "extensive negotiations" with a potential merger partner presented a jury question as to materiality. *Id.* at 182. That holding does not apply to this case, in which Plaintiff can at most establish a single "fruitless" discussion with a potential merger counterpart prior to Plaintiff Goeken's resignation.

Moreover, Plaintiffs have not provided factual support for the conclusory allegation that Defendant Kelly withheld information with the intent to "cause [Goeken] to forfeit his unvested interests at no cost." (Am. Compl. ¶ 346; Opp. Mem., at 19.) Accordingly, Plaintiffs have not sufficiently alleged scienter on this theory of fraud. Plaintiffs' first cause of action under section 10(b) of the Exchange Act is therefore DISMISSED for failure to state a claim.

### B.   Control Person Liability

As Plaintiffs have failed to plead a primary violation, they cannot establish control person liability. *See Rombach v. Chang*, 355 F.3d 164, 177-78 (2d Cir. 2004); *ATSI Commc'ns, Inc.*, 493 F.3d at 108. Plaintiffs' second cause of action under section 20(a) of the Exchange Act is DISMISSED.

### IV.   STATE LAW CLAIMS

Having dismissed all claims over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining state law and common law claims at this early stage in the litigation. *See* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims

SPA-18

over which it has original jurisdiction."); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994)

("[T]he exercise of supplemental jurisdiction is left to the discretion of the district court.")

## V.    <u>CONCLUSION</u>

Defendants' Motion to Dismiss the Amended Complaint is GRANTED.  Plaintiffs' first

cause of action for violations of § 10(b) and Rule 10b-5 and second cause of action for control

person liability under § 20(a) are DISMISSED with prejudice.  This Court declines to exercise

supplemental jurisdiction over Plaintiffs' state law claims.

The Clerk of Court is directed to close the motion at ECF No. 41 and this case.

Dated: New York, New York
      December 12, 2016                      SO ORDERED.

                                       GEORGE B. DANIELS
                                       United States District Judge

SPA-19

```
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/13/2016
```

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
TONYA BROWN, JOHN ELSTAD, ALBERT
GOEKEN, ELIZABETH HOMAN, and JEFFREY
SAMPERE,

Plaintiffs,

-against-

CERBERUS CAPITAL MANAGEMENT, L.P.,
CERBERUS COVIS LLC, COVIS HOLDINGS,
L.P., COVIS MANAGEMENT INVESTORS
LLC, COVIS U.S. INDUSTRIES US
HOLDINGS, LLC, COVIS MANAGEMENT
INVESTORS US LLC, COVIS
PHARMACEUTICALS, INC., PRINCETON
BIOPHARMA CAPITAL PARTNERS, LLC,
PRINCETON BIOPHARMA COINVESTMENT
I, L.P., ALEXANDER BENJAMIN, MICHAEL
KELLY, ETHAN KLEMPERER, and MICHAEL
WELLS,

Defendants.

-----------------------------------------------------------X

15 **CIVIL** 9022 (GBD)

**JUDGMENT**

       Defendants having moved to dismissed the Amended Complaint pursuant to Rules 9(b)

and 12(b)(6) of the Fed. R. Civ. P. and the Private Securities Litigation reform Act of 1885, 15

U.S.C. § 78u-4, and the matter having come before the Honorable George B. Daniels, United States

District Judge, and the Court, on December 12, 2016, having rendered its Memorandum Decision

and Order granting Defendants' motion to dismiss the Amended Complaint; dismissing with

prejudice Plaintiffs' first cause of action for violation of 10(b) and Rule 10b-5 and second cause of

action for control of person liability under § 20, this Court declining to exercise supplemental

jurisdiction over Plaintiffs state law claims, and directing the Clerk of Court to close this case,

       **ORDERED, ADJUDGED AND DECREED:** That for the reasons stated in the

Court's Memorandum Decision and Order dated December 12, 2016, Defendants' motion to dismiss

the Amended Complaint is granted; Plaintiffs' first cause of action for violation of 10(b) and Rule

10b-5 and second cause of action for control of person liability under § 20 are dismissed with

prejudice and this Court declines to exercise supplemental jurisdiction over Plaintiffs' state law

claims; accordingly, this case is closed.

**Dated:**  New York, New York
December 13, 2016

RUBY J. KRAJICK
_____
Clerk of Court
BY: _____
Deputy Clerk

THIS DOCUMENT WAS ENTERED
ON THE DOCKET ON _____

## 15 USCS § 78j

Current through PL 114-327, approved 12/16/16.

United States Code Service - Titles 1 through 54 > **TITLE 15. COMMERCE AND TRADE** > **CHAPTER 2B. SECURITIES EXCHANGES**

## Notice

🚩 *Part 1 of 4*. You are viewing a very large document that has been divided into parts.

## § 78j. Manipulative and deceptive devices

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

**(a)**

    **(1)** To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security other than a government security, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

    **(2)** Paragraph (1) of this subsection shall not apply to security futures products.

**(b)** To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement[,] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(c)**

    **(1)** To effect, accept, or facilitate a transaction involving the loan or borrowing of securities in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

    **(2)** Nothing in paragraph (1) may be construed to limit the authority of the appropriate Federal banking agency (as defined in section 3(q) of the Federal Deposit Insurance Act (12 U.S.C. 1813(q))), the National Credit Union Administration, or any other Federal department or agency having a

15 USCS § 78j

responsibility under Federal law to prescribe rules or regulations restricting transactions involving the loan or borrowing of securities in order to protect the safety and soundness of a financial institution or to protect the financial system from systemic risk.

Rules promulgated under subsection (b) that prohibit fraud, manipulation, or insider trading (but not rules imposing or specifying reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading), and judicial precedents decided under subsection (b) and rules promulgated thereunder that prohibit fraud, manipulation, or insider trading, shall apply to security-based swap agreements to the same extent as they apply to securities. Judicial precedents decided under section 17(a) of the Securities Act of 1933 [15 USCS § 77q(a)] and sections 9, 15, 16, 20, and 21A of this title [15 USCS §§ 78i, 78o, 78p, 78t, and 78u-1], and judicial precedents decided under applicable rules promulgated under such sections, shall apply to security-based swap agreements to the same extent as they apply to securities.

## History

(June 6, 1934, ch 404, Title I, § 10, 48 Stat. 891; Dec. 21, 2000, P.L. 106-554, § 1(a)(5), 114 Stat. 2763; July 21, 2010, P.L. 111-203, Title VII, Subtitle B, § 762(d)(3), Title IX, Subtitle B, § 929L(2), Subtitle I, § 984(a), 124 Stat. 1761, 1861, 1932.)

UNITED STATES CODE SERVICE

Copyright © 2017 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.

SPA-23

## [17 CFR 240.10b-5](#)

This document is current through the February 1, 2017 issue of the Federal Register   with the exception of the amendments appearing at 82 FR 8669, January 30, 2017 and at 82 FR 8903, February 1, 2017

 Code of Federal Regulations  >  **TITLE 17 -- COMMODITY AND SECURITIES EXCHANGES**  >  **CHAPTER II -- SECURITIES AND EXCHANGE COMMISSION**  >  **PART 240 -- GENERAL RULES AND REGULATIONS, SECURITIES EXCHANGE ACT OF 1934**  >  **SUBPART A -- RULES AND REGULATIONS UNDER THE SECURITIES EXCHANGE ACT OF 1934**  >  **MANIPULATIVE AND DECEPTIVE DEVICES AND CONTRIVANCES**

## § 240.10b-5 Employment of manipulative and deceptive devices.

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

**(a)** To employ any device, scheme, or artifice to defraud,

**(b)** To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

**(c)** To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

## Statutory Authority

(Sec. 10; [48 Stat. 891](#); [15 U.S.C. 78j](#))

## History

[[13 FR 8183,](#) Dec. 22, 1948, as amended at [16 FR 7928,](#) Aug. 11, 1951]

LEXISNEXIS' CODE OF FEDERAL REGULATIONS
Copyright © 2017, by Matthew Bender & Company, a member of the LexisNexis Group. All rights reserved.

**15 USCS § 78u-4**

Current through PL 114-327, approved 12/16/16.

United States Code Service - Titles 1 through 54 > **TITLE 15. COMMERCE AND TRADE** > **CHAPTER 2B. SECURITIES EXCHANGES**

## § 78u-4. Private securities litigation

**(a)** Private class actions.

  **(1)** In general. The provisions of this subsection shall apply in each private action arising under this title [15 USCS §§ 78a et seq.] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure.

  **(2)** Certification filed with complaint.

  **(A)** In general. Each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification, which shall be personally signed by such plaintiff and filed with the complaint, that--

  **(i)** states that the plaintiff has reviewed the complaint and authorized its filing;

  **(ii)** states that the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this title [15 USCS §§ 78a et seq.];

  **(iii)** states that the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary;

  **(iv)** sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint;

  **(v)** identifies any other action under this title [15 USCS §§ 78a et seq.], filed during the 3-year period preceding the date on which the certification is signed by the plaintiff, in which the plaintiff has sought to serve as a representative party on behalf of a class; and

  **(vi)** states that the plaintiff will not accept any payment for serving as a representative party on behalf of a class beyond the plaintiff's pro rata share of any recovery, except as ordered or approved by the court in accordance with paragraph (4).

**(B)** Nonwaiver of attorney-client privilege. The certification filed pursuant to subparagraph (A) shall not be construed to be a waiver of the attorney-client privilege.

**(3)** Appointment of lead plaintiff.

**(A)** Early notice to class members.

**(i)** In general. Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class--

**(I)** of the pendency of the action, the claims asserted therein, and the purported class period; and

**(II)** that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

**(ii)** Multiple actions. If more than one action on behalf of a class asserting substantially the same claim or claims arising under this title [15 USCS §§ 78a et seq.] is filed, only the plaintiff or plaintiffs in the first filed action shall be required to cause notice to be published in accordance with clause (i).

**(iii)** Additional notices may be required under Federal Rules. Notice required under clause (i) shall be in addition to any notice required pursuant to the Federal Rules of Civil Procedure.

**(B)** Appointment of lead plaintiff.

**(i)** In general. Not later than 90 days after the date on which a notice is published under subparagraph (A)(i), the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

**(ii)** Consolidated actions. If more than one action on behalf of a class asserting substantially the same claim or claims arising under this title [15 USCS §§ 78a et seq.] has been filed, and any party has sought to consolidate those actions for pretrial purposes or for trial, the court shall not make the determination required by clause (i) until after the decision on the motion to consolidate is

rendered. As soon as practicable after such decision is rendered, the court shall appoint the most adequate plaintiff as lead plaintiff for the consolidated actions in accordance with this paragraph.

**(iii)** Rebuttable presumption.

**(I)** In general. Subject to subclause (II), for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title [15 USCS §§ 78a et seq.] is the person or group of persons that--

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

**(II)** Rebuttal evidence. The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff--

(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

**(iv)** Discovery. For purposes of this subparagraph, discovery relating to whether a member or members of the purported plaintiff class is the most adequate plaintiff may be conducted by a plaintiff only if the plaintiff first demonstrates a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class.

**(v)** Selection of lead counsel. The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

**(vi)** Restrictions on professional plaintiffs. Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

**(4)** Recovery by plaintiffs. The share of any final judgment or of any settlement that is awarded to a representative party serving on behalf of a class shall be equal, on a

SPA-27

per share basis, to the portion of the final judgment or settlement awarded to all other members of the class. Nothing in this paragraph shall be construed to limit the award of reasonable costs and expenses (including lost wages) directly relating to the representation of the class to any representative party serving on behalf of a class.

**(5)** Restrictions on settlements under seal. The terms and provisions of any settlement agreement of a class action shall not be filed under seal, except that on motion of any party to the settlement, the court may order filing under seal for those portions of a settlement agreement as to which good cause is shown for such filing under seal. For purposes of this paragraph, good cause shall exist only if publication of a term or provision of a settlement agreement would cause direct and substantial harm to any party.

**(6)** Restrictions on payment of attorneys' fees and expenses. Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class.

**(7)** Disclosure of settlement terms to class members. Any proposed or final settlement agreement that is published or otherwise disseminated to the class shall include each of the following statements, along with a cover page summarizing the information contained in such statements:

**(A)** Statement of plaintiff recovery. The amount of the settlement proposed to be distributed to the parties to the action, determined in the aggregate and on an average per share basis.

**(B)** Statement of potential outcome of case.

**(i)** Agreement on amount of damages. If the settling parties agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title [15 USCS §§ 78a et seq.], a statement concerning the average amount of such potential damages per share.

**(ii)** Disagreement on amount of damages. If the parties do not agree on the average amount of damages per share that would be recoverable if the plaintiff prevailed on each claim alleged under this title [15 USCS §§ 78a et seq.], a statement from each settling party concerning the issue or issues on which the parties disagree.

**(iii)** Inadmissibility for certain purposes. A statement made in accordance with clause (i) or (ii) concerning the amount of damages shall not be admissible in

any Federal or State judicial action or administrative proceeding, other than an action or proceeding arising out of such statement.

**(C)** Statement of attorneys' fees or costs sought. If any of the settling parties or their counsel intend to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement, a statement indicating which parties or counsel intend to make such an application, the amount of fees and costs that will be sought (including the amount of such fees and costs determined on an average per share basis), and a brief explanation supporting the fees and costs sought. Such information shall be clearly summarized on the cover page of any notice to a party of any proposed or final settlement agreement.

**(D)** Identification of lawyers' representatives. The name, telephone number, and address of one or more representatives of counsel for the plaintiff class who will be reasonably available to answer questions from class members concerning any matter contained in any notice of settlement published or otherwise disseminated to the class.

**(E)** Reasons for settlement. A brief statement explaining the reasons why the parties are proposing the settlement.

**(F)** Other information. Such other information as may be required by the court.

**(8)** Security for payment of costs in class actions. In any private action arising under this title [15 USCS §§ 78a] et seq.] that is certified as a class action pursuant to the Federal Rules of Civil Procedure, the court may require an undertaking from the attorneys for the plaintiff class, the plaintiff class, or both, or from the attorneys for the defendant, the defendant, or both, in such proportions and at such times as the court determines are just and equitable, for the payment of fees and expenses that may be awarded under this subsection.

**(9)** Attorney conflict of interest. If a plaintiff class is represented by an attorney who directly owns or otherwise has a beneficial interest in the securities that are the subject of the litigation, the court shall make a determination of whether such ownership or other interest constitutes a conflict of interest sufficient to disqualify the attorney from representing the plaintiff class.

**(b)** Requirements for securities fraud actions.

**(1)** Misleading statements and omissions. In any private action arising under this title [15 USCS §§ 78a] et seq.] in which the plaintiff alleges that the defendant--

**(A)** made an untrue statement of a material fact; or

15 USCS § 78u-4

**(B)** omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

**(2)** Required state of mind.

**(A)** In general. Except as provided in subparagraph (B), in any private action arising under this title [15 USCS §§ 78a et seq.] in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this title [15 USCS §§ 78a et seq.], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

**(B)** Exception. In the case of an action for money damages brought against a credit rating agency or a controlling person under this title [15 USCS §§ 78a et seq.], it shall be sufficient, for purposes of pleading any required state of mind in relation to such action, that the complaint state with particularity facts giving rise to a strong inference that the credit rating agency knowingly or recklessly failed--

**(i)** to conduct a reasonable investigation of the rated security with respect to the factual elements relied upon by its own methodology for evaluating credit risk; or

**(ii)** to obtain reasonable verification of such factual elements (which verification may be based on a sampling technique that does not amount to an audit) from other sources that the credit rating agency considered to be competent and that were independent of the issuer and underwriter.

**(3)** Motion to dismiss; stay of discovery.

**(A)** Dismissal for failure to meet pleading requirements. In any private action arising under this title [15 USCS §§ 78a et seq.], the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

**(B)** Stay of discovery. In any private action arising under this title [15 USCS §§ 78a et seq.], all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

**(C)** Preservation of evidence.

**(i)** In general. During the pendency of any stay of discovery pursuant to this paragraph, unless otherwise ordered by the court, any party to the action with actual notice of the allegations contained in the complaint shall treat all documents, data compilations (including electronically recorded or stored data), and tangible objects that are in the custody or control of such person and that are relevant to the allegations, as if they were the subject of a continuing request for production of documents from an opposing party under the Federal Rules of Civil Procedure.

**(ii)** Sanction for willful violation. A party aggrieved by the willful failure of an opposing party to comply with clause (i) may apply to the court for an order awarding appropriate sanctions.

**(D)** Circumvention of stay of discovery. Upon a proper showing, a court may stay discovery proceedings in any private action in a State court, as necessary in aid of its jurisdiction, or to protect or effectuate its judgments, in an action subject to a stay of discovery pursuant to this paragraph.

**(4)** Loss causation. In any private action arising under this title [15 USCS §§ 78a et seq.], the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this title [15 USCS §§ 78a et seq.] caused the loss for which the plaintiff seeks to recover damages.

**(c)** Sanctions for abusive litigation.

**(1)** Mandatory review by court. In any private action arising under this title [15 USCS §§ 78a et seq.], upon final adjudication of the action, the court shall include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion.

**(2)** Mandatory sanctions. If the court makes a finding under paragraph (1) that a party or attorney violated any requirement of Rule 11(b) of the Federal Rules of Civil Procedure as to any complaint, responsive pleading, or dispositive motion, the court shall impose sanctions on such party or attorney in accordance with Rule 11 of the Federal Rules of Civil Procedure. Prior to making a finding that any party or attorney has violated Rule 11 of the Federal Rules of Civil Procedure, the court shall give such party or attorney notice and an opportunity to respond.

**(3)** Presumption in favor of attorneys' fees and costs.

**(A)** In general. Subject to subparagraphs (B) and (C), for purposes of paragraph (2), the court shall adopt a presumption that the appropriate sanction--

**(i)** for failure of any responsive pleading or dispositive motion to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an

award to the opposing party of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation; and

**(ii)** for substantial failure of any complaint to comply with any requirement of Rule 11(b) of the Federal Rules of Civil Procedure is an award to the opposing party of the reasonable attorneys' fees and other expenses incurred in the action.

**(B)** Rebuttal evidence. The presumption described in subparagraph (A) may be rebutted only upon proof by the party or attorney against whom sanctions are to be imposed that--

**(i)** the award of attorneys' fees and other expenses will impose an unreasonable burden on that party or attorney and would be unjust, and the failure to make such an award would not impose a greater burden on the party in whose favor sanctions are to be imposed; or

**(ii)** the violation of Rule 11(b) of the Federal Rules of Civil Procedure was de minimis.

**(C)** Sanctions. If the party or attorney against whom sanctions are to be imposed meets its burden under subparagraph (B), the court shall award the sanctions that the court deems appropriate pursuant to Rule 11 of the Federal Rules of Civil Procedure.

**(d)** Defendant's right to written interrogatories. In any private action arising under this title [15 USCS §§ 78a et seq.] in which the plaintiff may recover money damages, the court shall, when requested by a defendant, submit to the jury a written interrogatory on the issue of each such defendant's state of mind at the time the alleged violation occurred.

**(e)** Limitation on damages.

**(1)** In general. Except as provided in paragraph (2), in any private action arising under this title [15 USCS §§ 78a et seq.] in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

**(2)** Exception. In any private action arising under this title [15 USCS §§ 78a et seq.] in which the plaintiff seeks to establish damages by reference to the market price of a security, if the plaintiff sells or repurchases the subject security prior to the

expiration of the 90-day period described in paragraph (1), the plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security.

**(3)** Definition. For purposes of this subsection, the "mean trading price" of a security shall be an average of the daily trading price of that security, determined as of the close of the market each day during the 90-day period referred to in paragraph (1).

**(f)** Proportionate liability.

**(1)** Applicability. Nothing in this subsection shall be construed to create, affect, or in any manner modify, the standard for liability associated with any action arising under the securities laws.

**(2)** Liability for damages.

**(A)** Joint and several liability. Any covered person against whom a final judgment is entered in a private action shall be liable for damages jointly and severally only if the trier of fact specifically determines that such covered person knowingly committed a violation of the securities laws.

**(B)** Proportionate liability.

**(i)** In general. Except as provided in subparagraph (A), a covered person against whom a final judgment is entered in a private action shall be liable solely for the portion of the judgment that corresponds to the percentage of responsibility of that covered person, as determined under paragraph (3).

**(ii)** Recovery by and costs of covered person. In any case in which a contractual relationship permits, a covered person that prevails in any private action may recover the attorney's fees and costs of that covered person in connection with the action.

**(3)** Determination of responsibility.

**(A)** In general. In any private action, the court shall instruct the jury to answer special interrogatories, or if there is no jury, shall make findings, with respect to each covered person and each of the other persons claimed by any of the parties to have caused or contributed to the loss incurred by the plaintiff, including persons who have entered into settlements with the plaintiff or plaintiffs, concerning--

**(i)** whether such person violated the securities laws;

15 USCS § 78u-4

**(ii)** the percentage of responsibility of such person, measured as a percentage of the total fault of all persons who caused or contributed to the loss incurred by the plaintiff; and

**(iii)** whether such person knowingly committed a violation of the securities laws.

**(B)** Contents of special interrogatories or findings. The responses to interrogatories, or findings, as appropriate, under subparagraph (A) shall specify the total amount of damages that the plaintiff is entitled to recover and the percentage of responsibility of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs.

**(C)** Factors for consideration. In determining the percentage of responsibility under this paragraph, the trier of fact shall consider--

**(i)** the nature of the conduct of each covered person found to have caused or contributed to the loss incurred by the plaintiff or plaintiffs; and

**(ii)** the nature and extent of the causal relationship between the conduct of each such person and the damages incurred by the plaintiff or plaintiffs.

**(4)** Uncollectible share.

**(A)** In general. Notwithstanding paragraph (2)(B), [if,] upon motion made not later than 6 months after a final judgment is entered in any private action, the court determines that all or part of the share of the judgment of the covered person is not collectible against that covered person, and is also not collectible against a covered person described in paragraph (2)(A), each covered person described in paragraph (2)(B) shall be liable for the uncollectible share as follows:

**(i)** Percentage of net worth. Each covered person shall be jointly and severally liable for the uncollectible share if the plaintiff establishes that--

**(I)** the plaintiff is an individual whose recoverable damages under the final judgment are equal to more than 10 percent of the net worth of the plaintiff; and

**(II)** the net worth of the plaintiff is equal to less than $ 200,000.

**(ii)** Other plaintiffs. With respect to any plaintiff not described in subclauses (I) and (II) of clause (i), each covered person shall be liable for the uncollectible share in proportion to the percentage of responsibility of that covered person, except that the total liability of a covered person under this clause may not exceed 50 percent of the proportionate share of that covered person, as determined under paragraph (3)(B).

**SPA-34**

    **(iii)**   Net worth. For purposes of this subparagraph, net worth shall be determined as of the date immediately preceding the date of the purchase or sale (as applicable) by the plaintiff of the security that is the subject of the action, and shall be equal to the fair market value of assets, minus liabilities, including the net value of the investments of the plaintiff in real and personal property (including personal residences).

  **(B)** Overall limit. In no case shall the total payments required pursuant to subparagraph (A) exceed the amount of the uncollectible share.

  **(C)** Covered persons subject to contribution. A covered person against whom judgment is not collectible shall be subject to contribution and to any continuing liability to the plaintiff on the judgment.

**(5)** Right of contribution. To the extent that a covered person is required to make an additional payment pursuant to paragraph (4), that covered person may recover contribution--

  **(A)** from the covered person originally liable to make the payment;

  **(B)** from any covered person liable jointly and severally pursuant to paragraph (2)(A);

  **(C)** from any covered person held proportionately liable pursuant to this paragraph who is liable to make the same payment and has paid less than his or her proportionate share of that payment; or

  **(D)**   from any other person responsible for the conduct giving rise to the payment that would have been liable to make the same payment.

**(6)** Nondisclosure to jury. The standard for allocation of damages under paragraphs (2) and (3) and the procedure for reallocation of uncollectible shares under paragraph (4) shall not be disclosed to members of the jury.

**(7)** Settlement discharge.

  **(A)** In general. A covered person who settles any private action at any time before final verdict or judgment shall be discharged from all claims for contribution brought by other persons. Upon entry of the settlement by the court, the court shall enter a bar order constituting the final discharge of all obligations to the plaintiff of the settling covered person arising out of the action. The order shall bar all future claims for contribution arising out of the action--

    **(i)** by any person against the settling covered person; and

    **(ii)** by the settling covered person against any person, other than a person whose liability has been extinguished by the settlement of the settling covered person.

SPA-35

15 USCS § 78u-4

**(B)** Reduction. If a covered person enters into a settlement with the plaintiff prior to final verdict or judgment, the verdict or judgment shall be reduced by the greater of--

**(i)** an amount that corresponds to the percentage of responsibility of that covered person; or

**(ii)** the amount paid to the plaintiff by that covered person.

**(8)** Contribution. A covered person who becomes jointly and severally liable for damages in any private action may recover contribution from any other person who, if joined in the original action, would have been liable for the same damages. A claim for contribution shall be determined based on the percentage of responsibility of the claimant and of each person against whom a claim for contribution is made.

**(9)** Statute of limitations for contribution. In any private action determining liability, an action for contribution shall be brought not later than 6 months after the entry of a final, nonappealable judgment in the action, except that an action for contribution brought by a covered person who was required to make an additional payment pursuant to paragraph (4) may be brought not later than 6 months after the date on which such payment was made.

**(10)** Definitions. For purposes of this subsection--

**(A)** a covered person "knowingly commits a violation of the securities laws"--

**(i)** with respect to an action that is based on an untrue statement of material fact or omission of a material fact necessary to make the statement not misleading, if--

**(I)** that covered person makes an untrue statement of a material fact, with actual knowledge that the representation is false, or omits to state a fact necessary in order to make the statement made not misleading, with actual knowledge that, as a result of the omission, one of the material representations of the covered person is false; and

**(II)** persons are likely to reasonably rely on that misrepresentation or omission; and

**(ii)** with respect to an action that is based on any conduct that is not described in clause (i), if that covered person engages in that conduct with actual knowledge of the facts and circumstances that make the conduct of that covered person a violation of the securities laws;

**(B)** reckless conduct by a covered person shall not be construed to constitute a knowing commission of a violation of the securities laws by that covered person;

SPA-36

15 USCS § 78u-4

**(C)** the term "covered person" means--

**(i)** a defendant in any private action arising under this title [15 USCS §§ 78a et seq.]; or

**(ii)** a defendant in any private action arising under section 11 of the Securities Act of 1933 [15 USCS § 77k], who is an outside director of the issuer of the securities that are the subject of the action; and

**(D)** the term "outside director" shall have the meaning given such term by rule or regulation of the Commission.

## History

(June 6, 1934, ch 404, Title I, § 21D, as added and amended Dec. 22, 1995,P.L. 104-67, Title I, § 101(b), Title II, § 201(a), 109 Stat. 743, 758; Nov. 3, 1998, P.L. 105-353, Title I, § 101(b)(2), Title III, § 301(b)(13), 112 Stat. 3233, 3236.)

(As amended July 21, 2010,P.L. 111-203, Title IX, Subtitle C, § 933(b), 124 Stat. 1883.)

UNITED STATES CODE SERVICE

Copyright © 2017 Matthew Bender & Company, Inc. a member of the LexisNexis Group ™ All rights reserved.